## HESSEY ET AL. *v.* CAPITAL TRANSIT CO.

[No. 163, October Term, 1948.]

266

*Decided June 8, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Charles D. Harris, General Counsel to the Public Service Commission,* and *Philip H. Dorsey, Jr., People's Counsel,* for appellant.

*Clarence W. Miles* and *Harrison L. Winter,* with whom were *F. G. Awalt* and *Daryal A. Myse* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Capital Transit Company operates a passenger transportation system by electric railway cars and motor buses in the District of Columbia and also in Prince George's and Montgomery Counties in Maryland. In November, 1947, the company filed applications with the Public Service Commission of Maryland for permission (1) to charge a fare of five cents for each zone radiating a distance of about one mile and a half from the District line and (2) to discontinue its shuttle cars operating

between Branchville and Beltsville in Prince George's County.

At the hearing upon the applications in January, 1948, the transit company informed the Commission that in the year ending September 30, 1947, it lost on its operations in Maryland $117,963 on its rail lines and $470,191 on its bus lines. On April 22, 1948, the Commission entered an order on each application. On the first application it authorized the company to charge a fare of five cents for each Maryland zone on condition that it would sell tokens or tickets in multiples of five for fifteen cents for use by school children, each token or ticket to be good for a ride in one zone. The company appealed from that order, but it was affirmed by the Circuit Court of Baltimore City. The Court of Appeals, however, upon finding that the operations in Maryland were conducted at a heavy loss, held that the order for a three-cent fare for school children was arbitrary, unsupported by substantial evidence and unlawful. *Capital Transit Co. v. Bosley*, 191 Md. 502, 510, 62 A. 2d 267, 271.

We now have before us the application to abandon the line between Branchville and Beltsville. This line, built by the company in 1902, is a single-track line about three miles long. The original cost of the line, including the track and cable, was $115,393.94. The company also spent $996 for land, $3,221 for buildings, $660 for furniture and shop equipment, and $20,290 for two street cars. The two cars, which have provided the shuttle service at certain intervals, have been making connections with the street cars running between Washington and the Branchville loop, and with buses running to and from Greenbelt and the University of Maryland at College Park. Because of protests of residents of the area served by the line, the Commission dismissed the application to discontinue it on the ground that its operation is required by public convenience and necessity. The company, appealing from that order to the Circuit Court, alleged in its bill of complaint that the annual operating expenses, taxes and depreciation of the line far exceeded

the annual revenue from it. The Court sustained a demurrer to the bill, whereupon the company filed an amended bill and a transcript of all the evidence before the Commission. On December 6, 1948, the Court passed a decree restraining the Commission from enforcing its order and directing the Commission to permit the company to abandon the line. From that decree the Commission appealed to this Court.

It is a mandate of the Legislature that no common carrier, railroad corporation or street railroad corporation shall abandon or discontinue in whole or in part the exercise of any franchise or right, in so far as it is then actually being exercised for the public service, without the permission and approval of the Public Service Commission first obtained after due hearing, and the determination by the Commission that the present or future public convenience or necessity permit of such abandonment or discontinuance. In all proceedings in which the permission or approval of the Commission shall be applied for, the Commission may require that it be shown by clear and satisfactory evidence that the granting of such permission or approval is required by or consistent with the public interest; and when such proof is required the burden of proof shall be upon the applicant. Code 1939, art. 23, secs. 389, 390.

The Public Service Commission Law further provides that any person or corporation subject to any of the provisions of the statute, or any other person or party in interest, shall have the right to commence an action in the appropriate court against the Commission as defendant to set aside or have modified any order of the Commission on the ground that the order is unreasonable or unlawful. Code 1939, art. 23, secs. 359, 415; *Bosley v. Dorsey,* 191 Md. 229, 60 A. 2d 691. The decisions of the Commission are *prima facie* correct and are subject to review. An order of the Commission will not be disturbed except upon clear and satisfactory evidence that it is unreasonable or unlawful, but an order will be set aside if the Commission exceeded its jurisdiction or

arbitrarily disregarded the rights of the parties. Code 1939, art. 23, sec. 419; *Public Service Commission v. Byron*, 153 Md. 464, 479, 138 A. 404; *Howard Sports Daily v. Public Service Commission*, 179 Md. 355, 364, 365, 18 A. 2d 210; *Bosley v. Quigley*, 189 Md. 493, 505, 56 A. 2d 835, 841.

In this case the protestants asserted that the railway line from Beltsville to Washington has been more convenient than the buses on the Washington-Baltimore Boulevard for many persons who live nearer the track than the boulevard. They said that the shuttle cars have been especially convenient for the school children. Aside from those who use their own automobiles, about 50 per cent of the residents of the area between Branchville and Beltsville have been using the railway, while the other 50 per cent have been using the buses. One of the protestants, D. K. Hart, a resident of the Hollywood section of Berwyn, told the Commission: "While we would certainly hate to see the bus service on the Baltimore Boulevard done away with, it is not particularly desirable for the younger children and for ladies in the evening after dark because of the very heavy highway traffic."

However, the issue of paramount importance in this case is whether it is possible for Capital Transit Company to run the shuttle cars between Branchville and Beltsville without a loss. It is agreed that the cost of operation of a railroad line includes not only the expenses incurred exclusively for traffic on that line, but also a fair proportion of the expenses incurred for all traffic of which that in question forms a part. *Banton v. Belt Line Ry. Corporation*, 268 U. S. 413, 45 S. Ct. 534, 537, 69 L. Ed. 1020. In the instant case the company informed the Public Service Commission that for the year ending September 30, 1947, the cost of operation, taxes and depreciation of the shuttle line amounted to $57,355, while the revenue therefrom totalled only $22,440. Thus in one year the company suffered a loss of $34,915 from the operation of the three-mile line.

It is a recognized principle that a railroad company, organized and conducted for private corporate profit, but devoting its property to the use of the public, does not do so irrevocably or absolutely, but upon condition that the public will supply sufficient traffic on a reasonable rate basis to yield a fair return. If at any time it appears that further operation will result in loss, the company may discontinue operation and salvage whatever it can out of the property by dismantling the road. To compel a railroad to continue at a loss would amount to the taking of property without just compensation in violation of the due process clause of the Fourteenth Amendment of the Constitution of the United States. *Railroad Commission of State of Texas v. Eastern Texas R. Co.,* 264 U. S. 79, 44 S. Ct. 247, 68 L. Ed. 569. As we said in *Capital Transit Co. v. Bosley,* 191 Md. 502, 514, 62 A. 2d 267, 273, the State cannot under the guise of the police power take private property for public use without compensation. We specifically hold that a common carrier cannot be compelled to carry on even a branch of its business in an unbusinesslike way with resulting loss, unless it is necessary for the fulfillment of its corporate duties. If one branch of the service is unprofitable, it would be neither good business nor justice to compel the company to continue that branch merely because the loss could be offset by profit on the rest of the service. *Pennsylvania R. Co. v. Towers,* 126 Md. 59, 77, 94 A. 330, Ann. Cas. 1917B, 1144, affirmed 245 U. S. 6, 38 S. Ct. 2, 62 L. Ed. 117, L. R. A. 1918C, 475; *Crawford v. Duluth Street Ry. Co.,* 7 Cir., 60 F. 2d 212; *Brooks-Scanlon Co. v. Railroad Commission of Louisiana,* 251 U. S. 396, 40 S. Ct. 183, 64 L. Ed. 323.

Of course, as long as a railroad company exercises the privileges conferred by its charter, the State has the power to regulate its operations in the interest of the public, and so it may require it to fulfill an obligation imposed by the charter, even though fulfillment thereof may result in loss. As Justice Stone said in *United Fuel Gas Co. v. Railroad Commission of Kentucky,* 278

U. S. 300, 49 S. Ct. 150, 152, 73 L. Ed. 390: "The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give." Nevertheless, in the absence of an obligation imposed by statute or contract, the investors in a railroad company are not bound to go on with it at a loss, if there is no reasonable prospect of profitable operation. We recognize that the usual permissive charter of a railroad company does not give rise to any obligation on the part of the company to operate its road at a loss. In the case before us no statute or contract has been cited to show that the operation of the shuttle line between Branchville and Beltsville is obligatory upon the Capital Transit Company. Moreover, no implied contract that a railroad company will operate at a loss can be elicited from the acceptance of its charter or from the exercise of the power of eminent domain. *Bullock v. State of Florida,* 254 U. S. 513, 41 S. Ct. 193, 65 L. Ed. 380.

It was earnestly contended that many residents of the area had built their homes along the railway line on the supposition that the line would be operated for their convenience. However, time brings new conditions, and often the new conditions affect the owners of property. The transit company itself has been greatly affected by the increasing use of automobiles. In referring to the right of a railroad to discontinue operation when the earnings are inadequate, Justice Cardozo remarked: "It is idle to say that a railroad, when once it has been organized, is under a duty to go on, and hence that its distress is not important for any one except itself. Science has wrought its wonders, but the time is not yet here when trains will run under the impulsion of duty without more. * * * Nor is there need to show a probability of utter cessation or abandonment. Service is likely to be inefficient and even dangerous if operation

is continued in the face of an increasing deficit. The State has an interest in seeing to it that railroads shall be run, but an interest also in how they shall be run." *Williams v. Mayor and City Council of Baltimore*, 289 U. S. 36, 53 S. Ct. 431, 434, 77 L. Ed. 1015.

The attorneys for the Public Service Commission undertook to show how Capital Transit Company could operate the shuttle line without a loss. They claimed that $30,000 could be saved by running only one car instead of two. But it appears from the company's report that the trainmen's wages were less than $12,000 for each car; and Dean J. Locke, the company's staff engineer, who has had the benefit of 35 years of experience in the field of transportation, declared that the elimination of one car would not in his opinion produce a profit for the reason that curtailment in service would result in loss of revenue.

The staff engineer also asserted that the fare increase, which was recently authorized by the Public Service Commission, would not increase revenue to the extent of $16,746, as contended by the attorneys, as the higher fares would lessen the number of passengers. "Theoretically," he said, "the new fares would increase annual revenues approximately $16,746. This is wholly inadequate to cover the present losses. However, there probably would be some reduction of patronage as a result of the higher fares, so that only a portion of the $16,746 theoretical gain would actually be obtained. Still higher fares would further reduce the patronage." Accordingly the company maintains that, whatever may be the fare, it would be impossible to prevent a loss from the operation of the three-mile line. In the opinion of its experts, a fare of even 15 cents per zone, *i. e.*, a fare of 30 cents for the shuttle line, would not be enough to prevent a loss. It is significant that many of the protestants are unwilling to pay the increased fares that would be necessary to meet the cost of operation.

It is the considered opinion of the company that there is no reasonable prospect of an increase of patronage

in future years sufficient to enable it to operate the shuttle line without a loss. During the year ending September 30, 1947, an average of only between 7 and 10 passengers used the line per trip. During the morning rush toward Washington, and again in the afternoon rush toward home, there were usually several dozen passengers on the cars, but on some of the trips during the day there were no passengers at all. On a normal day about 700 passengers rode on the line. In order to meet the cost of operation, the company says it would have to carry each day at least five times as many passengers as it has been carrying. It is acknowledged that the communities served by the shuttle line have been growing in population. T. Raymond Burch, of College Park, estimated that the population of the area from Branchville to Beltsville is over 4,000. He counted 1,029 dwellings in the area, and said that 67 more are being built. But the company's staff engineer asserted that the number of passengers has been decreasing ever since 1943, notwithstanding the increase in population. In explaining why there is no prospect of an increase in patronage beyond its present low level, he said: "The past history of trends on this line certainly does not indicate the likelihood of an increase. In addition, the services rendered by Greyhound and Safeway bus lines, closely paralleling the shuttle car line, have a depressing effect. Further, the increasing use of the private automobile for the longer trips into town definitely limits the prospects of extended patronage."

The company also emphasized that a substantial capital expenditure is required to keep the line in good condition. The company's engineer of ways and structures testified that the condition of the track has deteriorated since 1902 to such an extent that its continued operation in its present condition is very dangerous. In his testimony before the Commission he said: "The original rails still exist and in the last few years during the war we had very much difficulty in obtaining sufficient ties. * * * The track became in very bad condition. We

hesitated about using the few ties we could get out on that line due to the little traffic.   * * *   Since July 1, 1947, we have installed 2,291 new ties in the line at an average cost of $11.29 a tie.   * * *   We are also attempting to install ballast on the property on the line as fast as we can obtain the ballast." He reported that in 1947 there were three derailments on the line caused by a spreading of rails due to defective ties. He stated that 2,500 additional ties would have to be installed to put the line in good condition, and these would cost at least $28,500.

Thus the evidence is clear and convincing (1) that Capital Transit Company has been sustaining substantial loss in the operation of the shuttle line; (2) that there is no prospect that the patronage would be sufficient to meet the cost of operating the line, even though the population of the area continues to increase; and (3) that the revenue from the line is not sufficient to justify the expenditure of the substantial sums necessary to keep the line in good condition. The conclusion is unavoidable that the company should be permitted to discontinue service on the line.

*Decree affirmed, with costs.*