## GAYWOOD COMMUNITY ASSOCIATION, INC., ET AL. v. METROPOLITAN TRANSIT AUTHORITY, ET AL.

[No. 169, September Term, 1966.]

*Decided April 4, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and FINAN, JJ.

*Paul T. McHenry, Jr.,* with whom was *John D. Callan* on the brief, for appellants.

*J. Edward Davis,* with whom was *John J. Ghinger, Jr.* on

the brief for Metropolitan Transit Authority, one of appellees; *Joseph Sherbow, Edward F. Shea, Jr.* and *Sherbow, Shea & Doyle* on the brief for the Baltimore Transit Company, other appellee.

HORNEY, J., delivered the opinion of the Court. BARNES, J., concurs in the result. Concurring opinion at page 101, *infra.*

When the Circuit Court for Baltimore County affirmed the order of the Metropolitan Transit Authority (MTA) authorizing the Baltimore Transit Company (BTC) to make a change in the bus route (known as Number Eleven) serving the communities of Rodgers Forge and Gaywood in Baltimore County, several of the protesting residents in the affected areas along with the Gaywood Community Association appealed to this Court.

The present or old northbound route digresses from Bellona Avenue at Dunkirk Road and proceeds easterly for two blocks to Pinehurst Road, then northerly for three blocks to Dumbarton Road, then westerly for three blocks to Rodgers Forge Road and then southwesterly back to Bellona Avenue. Both Dunkirk Road and Pinehurst Road (except the northernmost block of Pinehurst Road from Regester Avenue to Dumbarton Road) are twenty-four feet in width. The other streets (Dumbarton and Rodgers Forge Roads) in the present loop are thirty-six feet wide. The traffic on Dunkirk Road is one-way easterly and that on Pinehurst Road is one-way northerly. Parking is allowed on both sides of all streets.

The proposed or new route would begin at Blenheim Road and run easterly and northerly with the curving street to and through the intersection of Blenheim, Hopkins and Overbrook Roads, then easterly on Hopkins Road one block to Pinehurst Road and then northerly one block to reach the present route along Pinehurst, Dumbarton and Rodgers Forge Roads back to Bellona Avenue. Both Blenheim and Hopkins Roads are thirty-six feet wide with two-way traffic and parking is allowed on both sides of these roads.

The suggested alternative route, entirely on wider streets, would extend from Bellona Avenue northeasterly along Rod-

gers Forge Road and easterly along Dumbarton Road to Regester Avenue, then southerly and easterly to Pinehurst Road and northerly thereon to Dumbarton Road and then, partially retracing its forward course via Dumbarton and Rodgers Forge Roads westerly and southwesterly, back to Bellona Avenue.

The BTC has operated the bus line in question over that part of the old route in the Rodgers Forge-Gaywood area along Dunkirk Road from Bellona Avenue to Pinehurst Road for many years despite the difficulty in traversing two blocks of the narrow Dunkirk Road and negotiating a left turn therefrom onto the equally narrow Pinehurst Road. In an attempt to provide a safer route that would satisfy the residents and adequately service the area, the transit company, in 1961, applied to the Public Service Commission (PSC) for a change in the route which would substitute the wider Blenheim and Hopkins Roads for the two narrow blocks of Dunkirk Road. But the PSC, after a hearing, dismissed the application on the premise that no substantial advantage would be attained insofar as operating problems and accident hazards were concerned. No appeal was taken from the PSC findings and order.

As of January 1, 1962, the regulatory power, control and authority of the PSC over mass transportation systems was transferred to the MTA. See § 9 of Article 64B of the 1957 Code. Sometime prior to April of 1965, the MTA employed consulting engineers to prepare a transit improvement report embracing, among other things, a study of the bus routing with reference to the transit service within the Rodgers Forge-Gaywood area. The report (Phase I of the Transit Improvement Program) specifically recommended that buses be rerouted from Dunkirk onto Blenheim and Hopkins Roads. Subsequently, the chairman of the MTA, acting as an examiner pursuant to § 8(e) of Article 64B, conducted a hearing for the purpose of determining the propriety and feasibility of ordering the recommended rerouting.

Summarizing the testimony of a member of the firm of consultants, the executive director for the MTA, the traffic engineer of Baltimore County and a vice-president of the BTC, who testified on behalf of the proponents, there was, in addition to the general conclusion of the consultant that the need for mass

transportation in the area was constantly changing and continually required study and improvement, specific evidence to the effect that the narrow width of and parking on both sides of Dunkirk Road impeded the transit operation and increased the potential danger inherent in its continued use; that the proposed new and wider route on Blenheim and Hopkins Roads involved the least possible change in available streets; that any other route would be inconvenient for those residents of the area who are now using the old route; that the older buses are gradually becoming more obsolete and the wholly obsolescent ones are being replaced with longer and wider buses; that it is not feasible or reasonably possible to use the modern buses on scheduled operations on a narrow street; that it is extremely difficult to negotiate modern buses on narrow streets and that such buses have more maneuverability on wider streets; and that it is unfair to continue denying those who must use this long bus line the convenience and comfort of the more commodious and air-conditioned buses. The president of the Rodgers Forge Community Association presented a petition containing the signatures of three hundred and eighty residents of the Rodgers Forge area saying that they were against any proposal that would take the bus route off Pinehurst Road. Other residents on Blenheim and Hopkins Roads, opposing the new route or favoring an alternative one, testified that the change would have an adverse effect on safety and quietness as well as on property values and playground facilities in the area, but none of them attempted to refute the testimony that the operation of the buses would be safer and easier on the new route than on the old route. Nor was there any testimony on behalf of the protestants to offset the testimony that the change was a safer and highly desirable one. The membership of the Gaywood Community Association and others also protested the re-routing.

On the basis of the evidence produced at the hearing, the examiner—based on considerations of safety (the change to wider streets for use by longer and wider buses), service (the necessity and desirability of the change from an operational standpoint) and convenience (the nearness of the new route to the old in a heavily populated area)—recommended that the pro-

posed change be granted. On the basis of the report of the examiner, the MTA denied the exceptions of the protestants and signed an order approving the route change proposed by the examiner.

On the appeal to the circuit court, Judge Menchine, after stating that where the conditions and circumstances are identical a rule of law parallel with and akin to the doctrine of *res judicata* would operate to bar an administrative agency from reversing a prior decision made by it or (as in this case) made by a predecessor administrative agency unless legally sufficient changes have occurred to justify the present decision, concluded his opinion, affirming the ruling of the MTA, by saying:

> "The court has examined and considered carefully the record made before the Public Service Commission and the record made [for] the Metropolitan Transit Authority, and has concluded that there are differences of fact legally sufficient to permit, if not to require, the Metropolitan Transit Authority to reach a conclusion contrary to that made by the Public Service Commission. These differences are: (1) that there has been a four year further obsolescence in the buses customarily used on Line 11; (2) that it has been a consistent and reasonable determination by the Baltimore Transit Company to replace wholly obsolescent equipment by buses of longer length; and (3) that the utilization of such longer vehicles on Line 11 is not reasonably possible. These changes are in the view of the court sufficient to constitute substantial evidence of [such] change as would permit the ruling appealed from. In such circumstances, this court has no power to substitute its judgment for the judgment of the Authority and its decision may not be judicially disturbed except upon clear and satisfactory evidence that it is arbitrary, unlawful or unconstitutional (*Barton v. Public Serv. Comm.*, 214 Md. 359, 364)."

On the appeal to this Court, the protestants contend that the MTA is bound by the prior decision of the PSC, that the finding of the MTA was not based on substantial evidence and that

the MTA should have considered an alternative route. Conversely, the MTA contends that the changes in conditions were such as to justify a reversal of the prior administrative agency decision. And the BTC argues that the order of the MTA changing the route from a narrow to wider streets was not arbitrary.

The question then is whether or not the decision of the PSC in 1961 was *res judicata* to the decision of the MTA in 1965 and, if so, whether or not there were such substantial or significant changes in conditions during the intervening four-year period as would justify the rerouting of the bus line from the narrow Dunkirk Road to the wider Blenheim and Hopkins Roads. We think the circuit court was correct in affirming the order of the MTA.

It has been held that the principles of the doctrine of *res judicata* do not apply where the earlier decision as well as the later decision is made by an administrative agency. But this does not mean that such agencies are completely free to disregard prior rulings, for it is well settled that a mere change of mind is not an adequate or valid reason for reversing a previous finding. On the contrary, there must be evidence of fraud, surprise, mistake, inadvertence or some change in fact or in law in order to justify the reversal. *Schultze v. Montgomery County Planning Board,* 230 Md. 76, 185 A. 2d 502 (1962) ; *Kay Construction Co. v. County Council for Montgomery County,* 227 Md. 479, 177 A. 2d 694 (1962) ; *Whittle v. Board of Zoning Appeals of Baltimore County,* 211 Md. 36, 125 A. 2d 41 (1956) ; *Board of Zoning Appeals of Baltimore City v. McKinney,* 174 Md. 551, 199 Atl. 540 (1938) ; 2 Davis, *Administrative Law Treatise,* Ch. 18, § 18:03. In the *Whittle* case, which is as applicable to other administrative bodies as it is to zoning boards, it was said at p. 45 :

> "The general rule * * * seems to be that * * * a zoning appeals board may consider and act upon a new application for a special permit previously denied, but that it may properly grant such a permit only if there has been a substantial change in conditions. [Citations omitted.] This rule seems to rest not strictly on the doctrine of *res judicata,* but upon the propo-

sition that it would be arbitrary for the board to arrive at opposite conclusions on substantially the same state of facts and the same law."

The protestants rely on *Woodlawn Area Citizens Association v. Board of County Commissioners of Prince George's County,* 241 Md. 187, 216 A. 2d 149 (1966), to support their contention that *res judicata* applies to debar the MTA from changing the former PSC finding of facts. In so doing, however, the protestants seem to have overlooked the fact that it was the decision of a court and not an administrative agency that found the principles of *res judicata* controlling in that case. This alone distinguishes that case from this one. The point is well established. See *M. & C. C. of Baltimore v. Linthicum,* 170 Md. 245, 183 Atl. 531 (1936); *Bensel v. M. & C. C. of Baltimore,* 203 Md. 506, 101 A. 2d 826 (1954); *Chatham Corporation v. Beltram,* 243 Md. 138, 220 A. 2d 589 (1966); *Alvey v. Hedin,* 243 Md. 334, 221 A. 2d 62 (1966). While the action of an administrative agency reversing itself or a predecessor agency may resemble *res judicata,* it is *not,* as the cases show, the same as the final decision of a proceeding on its merits by a court of competent jurisdiction.

But even if a question of *res judicata* was before us, the result would be the same. For, in the record in this case, there is ample evidence that there were a number of substantial and significant changes in conditions and circumstances in the Rodgers Forge-Gaywood area during the four-year interim between the order of the PSC in 1961 and the order of the MTA in 1965. Besides the more significant changes referred to by the lower court—the worsened state of obsolescence of the older buses, the determination of the transit company to replace worn-out buses with more modern ones, and the infeasibility of using more modern buses on scheduled operations on over-parked narrow streets—there was substantial evidence that the need for mass transportation in the area was constantly changing and that the service to and convenience of the public would be enhanced by the more frequent use of modern buses on wider routes.

The further contention of the protestants that the MTA should have considered an alternative route must also be re-

jected for the reason that such of the evidence as bears on the point clearly indicates that the proposed alternative route would cause more inconvenience to the public as a whole than either of the other routes. In any case, this was a question for the MTA, not the courts, to decide. As was said in *Hartman v. P. S. C.,* 179 Md. 285, 19 A. 2d 709 (1941), at pp. 290, 291:

> "[T]his court must not be unmindful that we have no power to substitute our judgment for the judgment of the commission, whose orders are *prima facie* correct, and to which body the legislature had intrusted the duty and discretion of hearing and passing upon the permit under consideration. The task necessarily involves a consideration of many elements, such as advisability, public necessity, convenience and benefit to the public as a whole."

Our predecessors then went on to say that a reversal of the commission would have to be predicated on its having acted unreasonably, arbitrarily or unjustly. See also *Bosley v. Quigley,* 189 Md. 493, 56 A. 2d 835 (1948). And see *Hessey v. Capital Transit Co.,* 193 Md. 265, 66 A. 2d 787 (1949) and *Barton v. P. S. C.,* 214 Md. 359, 135 A. 2d 442 (1957).

We shall affirm the lower court.

> *Order affirmed; appellants to pay the costs.*

BARNES, J. concurring in the result:

I concur in the result in this case and in the statement in the majority opinion that a reversal of the Metropolitan Transit Authority's (MTA) order in this case would have to be predicated on its having acted unreasonably, arbitrarily or unjustly. I further agree that the order of the MTA is not the result of arbitrary, unreasonable and capricious action on its part and its order should be affirmed.

I disagree with the opinion of the majority that principles of the doctrine of *res judicata* could apply to the action of an administrative body because the action of administrative bodies in this State is always legislative or executive, and not judicial,

in character. My views on this question have been expressed fully in my concurring opinion in *Hyson v. Montgomery County Council*, 242 Md. 55, 77-84, 217 A. 2d 578 (1966), and my dissenting opinions in *Woodlawn Area Citizens Association v. Board of County Commissioners of Prince George's County*, 241 Md. 187, 203-13, 216 A. 2d 149 (1966) and *MacDonald v. Board of County Commissioners for Prince George's County*, 238 Md. 549, 586-88, 210 A. 2d 325 (1965) and need not be repeated here. As I pointed out in my dissent in *Woodlawn*, since Article IV of the Maryland Constitution vests *exclusive* judicial power in the *courts* of this State, it is, therefore, constitutionally impossible to delegate judicial power — *quasi* or otherwise—to either executive or legislative boards or commissions. Our predecessors specifically held this in *Dal Maso v. Board of County Commissioners of Prince George's County*, 182 Md. 200, 34 A. 2d 464 (1943), and although the rationale of *Dal Maso* has been criticized by Professor Davis in his work on Administrative Law, the case has never been overruled by this Court and we are, therefore, bound to follow it.

The *Dal Maso* holding does not mean that in performing its legislative functions a *mere change of mind* by an administrative body may not indicate arbitrary, unreasonable and capricious conduct amounting to a denial of due process of law *for that reason* in particular cases, but the principle on which the legislative action is held to be invalid is that of unreasonable, arbitrary and capricious conduct, and not the doctrine of *res judicata*. I pointed out in my dissenting opinion in *Woodlawn* that this distinction is not merely a matter of semantics, but involves fundamentally different concepts of constitutional law. (241 Md. at 208-09, 216 A. 2d at 162).

In my opinion, the majority opinion in the present case is in error in its statement that there have been any substantial or significant changes in conditions and circumstances in the Rodgers Forge-Gaywood area during the four year interim between the order of the Public Service Commission (PSC) in 1961 and the order of the MTA in 1965. The same streets are involved, the same traffic conditions are present and the same type of busses were owned by the Baltimore Transit Company when both orders were passed. J. Brooke Duvall, Jr., vice president

of the Baltimore Transit Company, testified that there was no change in the interim period:

> "Actually, there has been no change since the 1961 situation. At that time the Company on its own, in conjunction with the Staff of the then Public Service Commission and the then Traffic Engineer of Baltimore County, made the determination that the use of Blenheim Road and Hopkins Road would be preferable to that of Dunkirk. There has been no change in the situation in the intervening time, other than now we have an additional agency in the form of the consultants engaged by the Authority to make this study, we have come to the same conclusion, and subsequently, the Metropolitan Transit Authority Staff has come to the same conclusion and the present Traffic Engineer of Baltimore County has come to the same conclusion.
>
>     * * *
>
> "Q. Would you give an opinion, if you have one as to whether or not these 40-foot buses can feasibly operate the Dunkirk Avenue route? A. No. We do not think so. That is why I say the situation hasn't changed because we had that length bus back in 1961. It was one of the factors that we were keeping in mind in making our determination back in 1961."

Surely the mere passage of time with its inevitable depreciation of facilities, houses and other improvements, is not sufficient to result in a "change of conditions." These types of changes are always present in any case supposedly involving the doctrine of *res judicata,* and if sufficient, would nullify the application of the doctrine in every case.

The MTA—as successor to the PSC—in exercising its delegated legislative power, had the power to come to a different conclusion in 1964 than did the PSC in 1961 *on the same facts,* and unless that action was arbitrary, unreasonable and capricious (which it clearly was not in this case), the courts should not disturb that action by the MTA.

Even if it be assumed, *arguendo,* that in those cases involv-

ing the exercise of a so-called "quasi-judicial" function, a doctrine similar to that of *res judicata* could be applied, it is clear to me that the exercise of power by the MTA in the present case is not "quasi-judicial." Rather it is the exercise of a delegated legislative power, so that upon the same facts the administrative body may properly reach a different conclusion from the one reached previously. Our predecessors indicated this in *Public Service Commission v. Byron,* 153 Md. 464, 138 Atl. 404 (1927).

In *Byron,* the municipality of Hagerstown, on July 28, 1923, had applied to the Public Service Commission for a certificate of authority to build, maintain and operate a new electric plant. Upon the protest of the Potomac Edison Company and other taxpayers of Hagerstown, the PSC after a hearing filed, on December 31, 1923, an opinion and order refusing the certificate. Hagerstown reviewed its former application on April 9, 1926. Again, there were protests, but after a hearing, the PSC, on September 29, 1926, filed an order authorizing the work to be done and the necessary bonds issued. The opinion does not indicate that the factual situation was any different in 1926 than it was in 1923. An appeal was taken to the Circuit Court of Baltimore City. That court, by its decree of April 30, 1927, reversed the order of the PSC. This decree was reversed on appeal, Judge Parke, for the Court, stating:

> "Against this evidence and fair inferences the testimony of the appellees was not sufficient to prevail on a question of unreasonableness. It may be economically unwise for electric current and power to be generated and sold by the municipality as the proprietor of a public service enterprise, but *about this reasonable men may differ, as is demonstrated by the fact that the commission in 1923 was unanimously of the opinion that the certificate of authority should not be granted, and less than three years later, with a change of but one member, was a unit in granting the certificate of authority sought.* In our judgment the evidence establishes the order neither to be unlawful nor unreasonable, and this conclusion will result in a reversal of the decree passed on April 30th, 1927."

(Emphasis supplied). (153 Md. at 490, 138 Atl. at 414.)

See also *Albert v. Public Service Commission,* 209 Md. 27, 37-38, 120 A. 2d 346 (1956).

All of the cases relied on in the majority opinion for the proposition "that a mere change of mind is not an adequate or valid reason for reversing a previous finding," i.e., *Schultze v. Montgomery County Planning Board,* 230 Md. 76, 185 A. 2d 502 (1962) ; *Kay Construction Co. v. County Council for Montgomery County,* 227 Md. 479, 177 A. 2d 694 (1962) ; *Whittle v. Board of Zoning Appeals of Baltimore County,* 211 Md. 36, 125 A. 2d 41 (1956) ; *Board of Zoning Appeals of Baltimore City v. McKinney,* 174 Md. 551, 199 Atl. 540 (1938) were all cases involving the so-called "quasi-judicial" functions of an administrative body and not the exercise of a delegated legislative function as is involved in the case at bar.

As Professor Davis states in his Administrative Law Treatise, Sec. 18:03:

> "Some administrative determinations are clearly without res judicata effect in any circumstances—a zoning board after hearing amends a regulation, a utilities commission prescribes a maximum rate, the CAB decides which of two airlines should provide a particular service, or the NLRB refuses to issue a complaint on a particular charge."

The determination by the MTA in this case is most certainly this type of determination.