REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 361

September Term, 2015

_____

FORKS OF THE PATUXENT
IMPROVEMENT ASSOCIATION, INC.,
ET AL.

v.

NATIONAL WASTE MANAGERS/
CHESAPEAKE TERRACE

_____

Krauser, C. J.,
Kehoe,
Leahy,

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: October 25, 2016

This judicial review action is the latest episode of a prolonged effort by National Waste Managers/Chesapeake Terrace ("National") to construct and operate a rubble landfill on a large tract of land near Odenton, Maryland. In 2013, National applied for a variance to extend the time period for obtaining construction permits for the project. The variance application found its way to the Anne Arundel County Board of Appeals. The Forks of the Patuxent Improvement Association, Inc. (the "Association"), as well as several individuals, opposed the variance.

Four members of the Board participated in the hearing. After the hearing, the Board was evenly divided: two members of the Board (the "Approving Members") were in favor of granting the application and two members (the "Denying Members") voted to deny it. The Board concluded that the evenly-divided vote constituted a denial and entered an administrative order to that effect.

National filed a petition for judicial review in the Circuit Court for Anne Arundel County. The court concluded that: (1) the evenly-divided Board decision had the effect of denying the application; (2) the court's focus should be on the reasoning and findings of the Denying Members because their decision was dispositive on the application; and (3) the Denying Members applied erroneous standards to the evidence. The court set out its view of the appropriate legal standards, vacated the Board's decision, and remanded the matter to the Board for further proceedings consistent with its opinion.

The Association[1] appealed the court's judgment and poses one issue, which we have re-worded:

> Did the Board's evenly-divided 2-2 vote constitute a denial of National's application for a variance?

National filed a cross-appeal and presents three questions, which we have consolidated and re-phrased:

> Did the circuit court err in vacating and remanding the Board of Appeals' decision rather than reversing the Board's decision and ordering the Board to approve the variance application?

As we will explain, we agree with the circuit court's conclusions that the case must be remanded but see the relevant legal issues somewhat differently than did the circuit court and the members of the Board. Therefore, we will vacate the court's judgment and remand this case for further proceedings consistent with this opinion.

## Background

National owns a 481-acre tract of land in Anne Arundel County (the "Project Site"). In 1993, National applied for and received a special exception and variances from the Board to construct and operate a rubble landfill and a sand and gravel operation on the Project Site. The Board's approval was affirmed by the Court of Appeals in *Halle v. Crofton Civic Ass'n.*, 339 Md. 131 (1995). After obtaining the zoning approval, National had 18 months to obtain a construction permit for the project; if it failed to do so, the

---

[1] Several individuals, Ulis Fleming, Catherine Fleshman, Robert Fleshman, Sr., Diana Lane, Gregory Lane, Andrew Meyer, Sue Ellen Meyer, Michael Murphy, Stacy Murphy, Ann Marie Thomas, and Leon Thomas, also appealed the court's judgment. We gather that they are members of the Association.

special exception would lapse, unless it obtained a variance for an extension of time. *See* Anne Arundel County Code § 18-16-405.[2]

In order to obtain a construction permit from the County, National needed a solid waste refuse disposal permit from the Maryland Department of the Environment (the "MDE"). The MDE's review process for such permits consists of five phases. In summary, the phases are as follows:

> 1. Phase I centers on gathering basic information, such as the project's intended objectives, location, etc. This phase also gathers and compiles existing data about the site. The MDE circulates this information to various local, State, and Federal agencies for review and comment and to determine whether the site is suitable for the intended use. *See* COMAR 26.04.07.14.
>
> 2. Phase II consists of a hydrogeological investigation. The applicant is required to identify and analyze groundwater and geological conditions on the site. This report is also sent to local, State, and Federal agencies for review and comment. *See* COMAR 26.04.07.15.

---

[2] The Anne Arundel County Zoning Ordinance has been amended on numerous occasions in the years since National's application was first granted. Neither party suggests any of these amendments affect the appropriate legal analysis. We will refer to the current version of the County Code.

County Code § 18-16-405 states in pertinent part:

> **§ 18-16-405. Time period after which variances and special exceptions are void.**
>
> > (a) **Expiration by operation of law**. A variance or special exception that is not extended or tolled expires by operation of law unless the applicant within 18 months of the granting of the variance or special exception (1) obtains a building permit or (2) files an application for subdivision. Thereafter, the variance or special exception shall not expire so long as (1) construction proceeds in accordance with the permit . . . .
> >
> > * * * *
> >
> > (c) **Extension by variance**. An applicant may file an application for a variance to extend the time periods set forth in subsection (a).

- 3 -

3. Phase III entails engineering design. This phase takes all of the information gathered, especially the hydrogeological information from Phase II, and designs a landfill with these considerations in mind. *See* COMAR 26.04.07.16.

4. Phase IV is a review stage. The MDE uses this period to review all the information from Phases I–III to ensure that all of the statutory and regulatory requirements have been met. It then begins to prepare any and all documents it will need to present to the public on the proposed permit. During this phase, the MDE also drafts a proposed permit for the site.

5. Phase V is the public comment stage. The MDE advertises and holds a hearing on the draft permit and invites the public to submit comments on the proposal. After the public comments are received, the MDE engages in a final review, and then either issues the permit as is, issues it with modifications, or denies the permit.

National began this process in 1991, in conjunction with its then-pending application for a special exception. In 1994, however, the MDE suspended review because the County had amended its Solid Waste Management Plan to omit any reference to the Project Site.[3] Litigation between National and the County on the amendment culminated in National's favor by means of an unreported decision of a panel of this Court in *National Waste Managers, Inc. v. Anne Arundel County*, No. 810, September Term, 1997, filed March 25, 1998 ("*National I*"). The County then took the position that National's special exception permit had lapsed pursuant to a prior version of what is now County Code § 18-16-405. This resulted in another lawsuit, which was also finally resolved in National's favor by our decision in *National Waste Managers, Inc. v. Anne*

---

[3] MDE may not issue a permit for a proposed landfill unless the project is consistent with the county's Solid Waste Management Plan. *See* Environmental Law Article § 9-201(a)(3)(ii).

*Arundel County*, 135 Md. App. 585 (2000) ("*National II*").[4] In *National II*, we held that the 18-month time limit in what is now County Code § 18-16-405 was tolled during the pendency of the litigation between National and the County. *Id.* at 614.

In 2001, MDE resumed its process of reviewing National's proposal. MDE was unable to complete its review within the 18-month period set out in County Code § 18-16-405.[5] Therefore, National filed for a variance for an extension of time to begin construction in 2003. In 2004, the variance was granted. The Board of Appeals found that exceptional circumstances, namely MDE's ongoing review of the Project Site, made it impossible for National to implement the previously approved special exceptions and variances within the allotted time and that an extension of two years was the minimum necessary to afford relief to National.

Between 2004 and 2013, National filed three more variance applications for extensions of time, each based upon assertions that, although it had pursued its permit from MDE with due diligence, the agency had been unable to complete its review and approval process. The Board of Appeals approved the first two variance requests in 2006 and 2011. The extension granted in 2011 expired on January 3, 2013.

In its current variance application, National sought an additional two year extension to obtain the necessary permits. An administrative hearing officer granted the application

[4] There was additional litigation regarding National's proposed rubble fill. It is described in *National II*, 135 Md. App. at 591–97.

[5] Because of the passage of time and changing regulations, MDE required National to perform additional geological and groundwater studies. Evidence before the Board in the current proceeding indicated that obtaining this information took several years.

after a public hearing. The County Code provides that aggrieved persons may appeal an AHO's decision to the Board, which conducts its own *de novo* proceeding. County Code § 18-16-402. Appellants filed such an appeal.

The Board's hearing in this case began on June 6, 2013 and was completed on October 15th of that year. The Board issued an evenly divided 2-2 decision on December 27, 2013. The Approving Members voted to grant the application and the Denying Members voted to deny it. After summarizing the evidence presented to the Board, and explaining the differing conclusions that each group drew from that evidence, the Board concluded:

> The legal effect of the inability of the Board to reach a majority is that [National] did not meet [its] burden of persuasion and the request for variances for time extension must be denied. When an appeal of this nature is placed before the Board, it is heard *de novo,* and the burden of proof and persuasion is placed upon [National]. See *Montgomery County Board of Appeals v. Walker*, 228 Md. 574, 180 A.2d 865 (1962); *Lohrmann v. Arundel Corp.*, 65 Md. App. 309, 500 A.2d 344 (1985). If a majority is not persuaded upon substantial evidence, the application must be denied. *Id.*

National filed a petition for judicial review of the Board's decision in the circuit court. It presented a variety of arguments to the circuit court, but only two of them are relevant to the current appeal: (1) whether the Board's evenly-divided vote had the legal effect of denying National's application; and (2) whether the Denying Members applied the correct legal standard in assessing the evidence. On the first issue, the circuit court concluded that the Board's 2-2 vote constituted a denial of the application. However, on the second issue, the court concluded that the Denying Members relied on an erroneous legal standard. Thus, the court vacated the Board's decision and remanded the case for

reconsideration. The Association has appealed, and National cross-appealed, the circuit court's judgment.

**Analysis**

Standard of Review

When this Court reviews the final decision of an administrative agency, we "look through" the circuit court's decision, and, although applying the same standards of review, independently evaluate the agency decision. *People's Counsel for Baltimore County v. Surina,* 400 Md. 662, 681 (2007). In this exercise, our review is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Id.* at 682 (citation and quotation marks omitted). Finally, "[a] reviewing Court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *Eastern Outdoor Advertising Co. v. Mayor & City Council of Baltimore*, 128 Md. App. 494, 516 (1999) (quotation marks and citation omitted).

I.

The Association contends that the Board's 2-2 evenly-divided vote on National's application had the legal effect of denying National's variance application. The Association relies on this Court's decision in *Lohrmann v. Arundel Corp.*, 65 Md. App. 309 (1985) for support. We agree that our prior decision is dispositive as to the legal effect of an evenly-divided decision by an administrative agency.

*Lohrmann* was not a judicial review proceeding but rather was an appeal from a declaratory judgment to the effect that an evenly-divided decision of the Anne Arundel County Board of Appeals left the decision of the administrative hearing officer in effect. *Id.* at 311–12. In our analysis, we began by noting that, pursuant to the County's charter, the Board of Appeals exercises original *de novo* jurisdiction over all matters that come before it. *Id.*[6] We concluded that, because the Board was exercising original jurisdiction:

> [i]t was as though the zoning officer had made no decision. In that situation, [the applicant] had the same burden it had before the zoning officer—"the burden of proof (including the burden of going forward with the evidence and the burden of persuasion) of all questions of fact." [County Code] § 13-341.2(a) . . . . *The evenly-divided Board decision demonstrates that it did not meet that burden. Accordingly, the effect of the Board's action was to deny [the applicant's] request for a special exception.*

*Lohrmann*, 65 Md. App. at 319–20 (citation omitted, emphasis added).

In its cross-appeal, National asserts that *Lohrmann* is not controlling because "the Court of Appeals on two occasions addressed cases involving 'split votes' in *de novo* appeals to Boards of Appeal, from decisions of zoning hearing officers." National cites *Levy v. Seven Slade, Inc.*, 234 Md. 145 (1964) and *Stocksdale v. Barnard*, 239 Md. 541 (1965), in support of this proposition. National concedes, however, that the *Lohrmann* Court distinguished both *Levy* and *Stockdale* because in neither case "was an issue raised as to the effect of a split decision on a *de novo* administrative appeal. No doubt for that

---

[6] Section 603 of the County Charter provides, in pertinent part, that "[a]ll decisions by the County Board of Appeals shall be made after notice and hearing de novo upon the issues before said Board."

reason the Court of Appeals did not address that issue, instead of treating the cases as though they involved non-*de novo* appeals." *Lorhmann*, 65 Md. App at 316 n.3.

*Lohrmann's* scholarly and well-reasoned analysis is as cogent today as it was when the opinion was filed more than thirty years ago. We see no reason to depart from our long-established holding. Because the Denying Members prevailed in rendering their decision on National's application, it is their factual findings and conclusions of law that we will review in determining whether the Board erred in denying the application. *See Mombee TLC, Inc. v. Mayor and City Council of Baltimore*, 165 Md. App. 42 (2005) ("[N]o principled legal distinction can be drawn between what is required of a prevailing majority in rendering its decision and that which is required of a prevailing minority in imposing its will . . . . Therefore, . . . just as a prevailing majority must do, a prevailing minority must . . . issue findings of fact and conclusions of law.").

We now turn to what is the dispositive issue in this case, namely, whether the Denying Members' decision was supported by a "reasonable basis in fact" and was not arbitrary or capricious.

## II.

Our analysis begins with County Code § 3-1-207, which sets out the criteria by which the Board is to decide whether to issue a variance. The statute states in pertinent part:

> (a) Generally. The Board of Appeals may vary or modify the provisions of Article 18 of this Code when it is alleged that practical difficulties or unnecessary hardships prevent carrying out the strict letter of that article, provided the spirit of law shall be observed, public safety secured, and

substantial justice done. A variance may be granted only upon an affirmative finding that:

* * * *

(2) because of exceptional circumstances other than financial considerations, the grant of a variance is necessary to avoid practical difficulties or unnecessary hardship, and to enable the applicant to develop the lot.

* * * *

(e) Required findings. A variance may not be granted under subsection (a) or (b)[7] unless the Board finds that:

(1) the variance is the minimum variance necessary to afford relief;

(2) the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) reduce forest cover in the limited and resource conservation areas of the critical area;

(iv) be contrary to acceptable clearing and replanting practices required for development in the critical area or bog protection area; or

(v) be detrimental to the public welfare.[8]

As the applicant, National "has the burden of proof, including the burden of going forward with the production of evidence and the burden of persuasion, on all questions of fact." County Code § 18-16-301.

---

[7] Subsection (b) sets out criteria for variances from the County's critical area and bog protection program.

[8] The parties do not dispute that the Board has the authority to grant a time variance. *See Lanzaron v. Anne Arundel County*, 402 Md. 140, 143 (2007) ("We hold that the variance power at issue in this case authorized the Board to issue time variances, and that under the language used here, the general variance power found in Article 3 reaches all provisions in Article 28 of the Anne Arundel County Code (the Zoning Code) except where the general power is restricted by specific language limiting the general variance power.").

The Denying Members found that:

> (1) there were no "exceptional circumstances that would create practical difficulties or unnecessary hardship for [National] to develop the lot within the time frames previously granted by the Board" because National had not been diligent in pursuing the MDE application;

> (2) the two year variance requested by National was insufficient to complete the review process with MDE and obtain final County permits; and

> (3) the prolonged uncertainty created by the application, already pending for 12 years, has negatively affected the surrounding community and "[b]y allowing further time extensions, this project, which has no end in sight, will continue to burden this community and alter the essential character and development of the surrounding neighborhoods."

In its brief, the Association asserts that *Lohrmann* requires reversal of the circuit court's judgment because "the evenly-divided Board of Appeals decision means that [National] did not meet its burden of proof or persuasion[.]" For its part, National contends that the Denying Members' findings were entirely unsupported by evidence in the record, were irrelevant, or both.

In addressing these contentions, we will examine each of the bases that the Denying Members relied on in arriving at their conclusion and in so doing will address: (1) the weight the Board should give to National's "due diligence," or the lack thereof, in deciding whether exceptional circumstances exist that have created practical difficulties for National's development of Project Site; (2) the meaning of the requirement that the variance be the "minimum necessary to afford relief;" and (3) the proper frame of analysis to determine whether granting the variance would either "alter the essential character of the neighborhood," or "substantially impair the appropriate use or development of adjacent property[.]"

*Diligence*

On January 3, 2011, the Board granted a variance which allowed National two additional years, that is, until January 3, 2013, to obtain the necessary permits. The Denying Members concluded that National failed to demonstrate that it would suffer unnecessary hardship because it had failed to diligently pursue its approvals in this period. The evidence before the Board was mixed.

At the hearing, National called Edward Dexter, the chief of MDE's landfill review program, as a witness. Dexter testified that the period of time MDE took to review landfill applications varied, "but usually . . . three to seven [years] is typical." Although his testimony was guarded as to the specifics, Dexter indicated that a previous environmental consultant hired by National to coordinate its application process had not been entirely satisfactory but that National had hired a different consultant shortly after the Board granted the 2011 variance.

Veronica Foster, a registered civil engineer who is the current "team leader" for National's efforts to obtain the MDE permits, testified that the prior team leader retired in 2011 "for a number of reasons, including his health." A letter dated December 20, 2012 from Dexter to National's counsel stated that "[o]ver the last year, . . . National has been actively pursuing this application." Foster took charge of the project in January, 2012. Additionally, Dexter testified that National had, "generally speaking," been diligent in pursuing approval since 2001. With regard to the past two years, Dexter further testified that National had "been aggressively pursuing" the project.

John Fury, a member of the County's planning staff, prepared a report for the Board's use in the variance hearing. The report stated that "[i]t is evident that the applicant has been diligently pursuing project approval through the [MDE] since the original special exception and variance approvals were granted in 1993."

None of this evidence was contradicted or challenged by the opponents to the variance. Even so, the Denying Members were not convinced. Their opinion identified two reasons for their conclusions. First, the Denying Members identified what they saw as a pattern of foot-dragging on National's part in response to requests for additional information from MDE:

> [National] received a letter from MDE on March 3, 2011 raising 28 specific items. [National] did not respond until over a year later on March 22, 2012. MDE responded on July 19, 2012 with a request to supplement data from 2004. [National] did not meet with MDE until September 2012 and it took until March 1, 2013 to receive approvals to begin the process necessary for [National] to supply MDE with additional information requested.

Second, the Denying Members referenced National's failure to pursue the remaining County permits while MDE's review was on-going.

National had the burden of production and persuasion. Our assessment of the evidence before the Board is that National met its burden of production, but that National's failure to pursue the County permits at the same time as it was seeking the MDE approvals was a basis from which a fact-finder could conceivably conclude that National had not been diligent in pursuing the permits with MDE in 2011.

Nonetheless, the Denying Members' conclusion was problematic because it did not connect any lack of diligence on National's part with the unnecessary hardship standard

under County Code § 3-1-207(a)(2). A lack of diligence in itself is insufficient to conclude that National did not face an unnecessary hardship. A lack of diligence is relevant only if National could have obtained the permits within the 2011–2013 time period if it had acted diligently. The Denying Members did not address this issue.

*The Minimum Variance Necessary*

The Denying Members concluded that a variance for an additional two years was not the minimum variance necessary to grant relief to National. They reasoned that, if the past is an accurate predictor of the future, National will have neither MDE nor final County approval within two years. Therefore, they reasoned, the application failed to satisfy County Code § 3-1-207(e)(1)'s requirement that the Board grant only the minimum variance necessary to afford relief to the applicant. We disagree with the Denying Members' interpretation of the "minimum variance necessary" requirement and with their application of that statutory standard to the evidence in this case.

We will start with the evidence. Dexter, the MDE official supervising the review of National's application, testified that he anticipated that the MDE would complete its Phase III review in calendar year 2013,[9] and all of the remaining phases within two years. Veronica Foster, National's land fill design expert and the team leader for the project, agreed. Linton Pumphrey, the Association's expert, testified that the project also required additional permitting from the County and that the County process would take

---

[10] The record indicates that Phase III is the most complex and time-consuming stage of MDE's review process.

approximately three years. Finally, Fury, the representative of the County's planning staff, testified that he agreed with Pumphrey and that obtaining all necessary permits could take up to four to six additional years. Nonetheless, Fury recommended that any variance granted by the Board be for two years, to be consistent with the Board's prior practices. (Fury's recommendation also had the perhaps not entirely coincidental effect of holding National's feet to the fire with regard to diligently pursuing the necessary permits.) We turn to the applicable law.

Section 3-1-207(a) authorizes the Board to grant variances to alleviate "practical difficulties or unnecessary hardships . . . provided the spirit of law shall be observed, public safety secured, and substantial justice done[.]" In the context of the facts before the Board in this case, the variance can be granted only if there are "exceptional circumstances other than financial considerations[.]" Section 3-1-207(a)(2). If these criteria, as well as the others contained in the statute, are satisfied, then the Board may grant a variance that is the minimum necessary to avoid the "practical difficulties or unnecessary hardship[s]" that have been demonstrated by the applicant. In other words, the "minimum variance necessary" provision prohibits the Board from granting *more* relief than is necessary to avoid the relevant practical difficulty or relevant hardship.

When we apply the appropriate legal test to the evidence before the Board, we conclude that there was no evidence that the permitting process could be completed in less than two years. But the Denying Members turned the statutory standard on its head, concluding that the "minimum necessary" requirement was not satisfied because it was likely that MDE would require *more* than two years to complete its review of the Project

Site. This is not the proper frame of analysis, and thus the Denying Members' denial of the variance based on the "minimum necessary" criterion was error.

*The Essential Character of the Neighborhood / Impairing the Use and Development of Surrounding Properties / Detrimental to the Public Welfare*

The Denying Members concluded that granting "the requested variances to the time limits for the implementation and completion" of the landfill project "will alter the essential character of this neighborhood,"[10] "will substantially impair the appropriate use or development of surrounding properties,"[11] and will therefore be "detrimental to the public welfare."[12] Their reasoning for each conclusion was essentially the same (emphasis added):

> This community has been evolving and changing in the 20 years since the initial grant of the special exceptions and the variances for this project. As such, the *community has been actively awaiting* the finalization of this project during that time frame and diligently pursued [its] status[.] By allowing further time extensions, this project, which has no end in sight, *will continue to burden this community and alter the essential character* and development of the surrounding neighborhoods.
>
> * * * *
>
> By allowing further extensions, the development of adjacent properties will continue to be affected as community *members and developers of the area wonder whether or not they will eventually live near or adjacent to a landfill.*
>
> * * * *
>
> The time extension will be detrimental to the public welfare.

As we understand the Denying Members' analysis, they concluded that:

---

[10] Section 3-1-207(e)(2)(i).

[11] Section 3-1-207(e)(2)(ii).

[12] Section 3-1-207(e)(2)(v).

(1) the continuing pendency of National's rubble landfill application by itself would alter the essential character of the neighborhood; and

(2) granting the variance—and thus extending the period in which National's application will be pending—would be detrimental to the public welfare because property owners and residents of the surrounding area would remain uncertain as to whether the project will be constructed.

We do not agree with the Denying Members' logic. That the application is pending, by itself, does not change the character of the neighborhood. We doubt that residents' uncertainty as to whether the rubble landfill project will ever be operational is a sufficient basis to deny the application without evidence that the uncertainty has affected property values.

In this context, our predecessors' analysis in the landmark decision of *Anderson v. Sawyer*, 23 Md. App. 612, 613 (1974), is instructive. In *Anderson,* this Court examined a decision by the Baltimore County Planning Board denying a special exception application to build a funeral home in an area zoned for residential use. At issue was whether the psychologically depressing effect of living next to a funeral home, and the potential effect that a funeral home might may have on the value of surrounding properties, was sufficient to deny the application. *Id.* at 624. We determined that "the bald allegation that a funeral home use is inherently psychologically depressing and adversely influences adjoining property values, as well as other evidence which confirms that generally accepted conclusion, is insufficient to overcome the presumption that such a use promotes the general welfare of a local community." *Id.* at 625.

All pending development projects, at least projects as massive as the one proposed by National, create uncertainty among neighboring property owners. Nonetheless, the

- 17 -

County Council has authorized the Board to extend the time frame for obtaining permits through the variance process. *Anderson* was a special exception case and this appeal involves a variance, and we recognize that the statutory criteria are somewhat different. Nonetheless, *Anderson's* underlying logic remains pertinent. We conclude that uncertainty created by National's pending application among neighboring property owners is not, by itself, a sufficient basis to deny the variance.

However, we do not agree with the Approving Members' reasoning as to the statutory criterion that the variance must not "alter the essential character of the neighborhood." The Approving Members concluded that it was inappropriate to consider whether the proposed use will adversely impact the surrounding neighborhood (emphasis added, citation omitted):

> The granting of the requested variance to the time limits . . . will not alter the essential character of this neighborhood. [W]e find that the character of the neighborhood is that of mixed uses that range from rural residential to commercial resources in the Odenton community. The Petitioners have an approved, lawful special exception on this site. The approved use of this property as a sand and gravel operation and a rubble landfill is known within the community and, we believe is part of the character of the community. *Our focus here is not on the special exception for the rubble land fill . . . but rather, on whether a variance to permit a 2 year extension will change the character of the neighborhood.* The current variance does nothing more that give Petitioners additional time to finalize State approval and obtain County permits. Therefore, we do not find that the time extension will alter the essential character of the neighborhood.
>
> * * * *
>
> *The time extension will not be detrimental to the public's welfare. No traffic will result from the grant of the time extension. No impacts to water will result from the grant of the time extension.* . . . The variances merely permit the applicant to complete the application process. . . . The original 1993 decision determined that these uses have public benefit and are needed. *We make no decision on the merit of the underlying special exception and associated variances.*

The problem with the Approving Members' analysis is that it treated the variance as an end in itself and overlooked the fact that the purpose of the variance is to permit National to build its project if it eventually obtains the necessary permits.

From our perspective, both the Denying Members and the Approving Members missed the proper frame of analysis for determining whether granting the variance will alter the character of the neighborhood, adversely impact adjacent properties, or be detrimental to the public welfare. The Denying Members noted in their opinion that the "community has been evolving and changing in the 20 years since the initial grant of the special exceptions and variances for this project." The Approving Members, in effect, concluded that changes in the neighborhood were irrelevant. Neither faction of the Board examined whether changes in the community rendered National's proposed use of the Project Site as a rubble landfill incompatible with the surrounding neighborhood *as it currently exists*. We conclude that this is the proper frame of analysis for deciding whether granting the variance will alter or adversely impact the surrounding neighborhood or be detrimental to the public welfare.

Our conclusion is grounded in Maryland case law which requires that a special exception only be granted when the proposed use is compatible with the use and the uses of surrounding properties. As the Court explained in *People's Counsel for Baltimore County v. Loyola College*, 406 Md. 54, 106 (2008) (emphasis added):

> The local legislature, when it determines to adopt or amend the text of a zoning ordinance with regard to designating various uses as allowed only by special exception in various zones, considers in a generic sense that certain adverse effects, at least in type, potentially associated with (inherent to, if you will) these uses are likely to occur wherever in the particular zone

they may be located . . . . That is why the uses are designated special exception uses, not permitted uses. The inherent effects notwithstanding, the legislative determination necessarily is that the uses conceptually are compatible in the particular zone with otherwise permitted uses and with surrounding zones and uses already in place, *provided that, at a given location, adduced evidence does not convince the body to whom the power to grant or deny individual applications is given that actual incompatibility would occur.*

The critical importance of compatibility between existing uses and the proposed use is certainly reflected in Anne Arundel County's variance criteria. An incompatible project will "alter the essential character of the neighborhood . . . in which the lot is located,"[13] and will "substantially impair the appropriate use and development of the surrounding property."[14]

The reasoning of the Board when it granted National's special exception application in 1993 conformed to this principle. The judicial review proceeding arising out of the Board's grant of National's special exception and variance application in 1993 culminated in *Halle v. Crofton Civic Association*, 339 Md. 131 (1995). In its opinion affirming the Board's decision, the Court commented:

> After three months of deliberation, an on-site visit by the members of the Board to the property, and a review of the record taken as a whole— consisting of more than 2,000 pages of transcribed testimony and voluminous documents—the Board determined that the landfill would advance the public welfare of the County. It recognized the need for the landfill, *concluded that its location was well suited to the use*, *and determined that the special exception and variance proposals would benefit the vicinal community* by reclaiming and restoring previously mined ravines and properties "cratered" up to the property line.

---

[13] BCC § 3-1-207(e)(2)(i).

[14] BCC § 3-1-207(e)(2)(ii).

*Id.* at 137 (emphasis added).

The Approving Members were concerned about the propriety of relitigating the 1993 special exception application in the 2013 variance hearing. But deciding whether the landfill project remains compatible with the surrounding neighborhood is not an attack upon the validity of the Board's 1993 decision. Instead, it is a recognition that a neighborhood may change over time and that a use that was compatible when the special exception was originally granted may no longer be compatible when the variance to extend the time to obtain the permits is sought.

We conclude that the requirements for granting a variance in County Code § 3-1-207 pertaining to the surrounding neighborhood, adjacent properties, and public welfare are intended to ensure that a variance for an extension of time should be granted only if the previously approved special exception use continues to be compatible with the surrounding area. The applicant bears the burden of demonstrating to the Board that its proposed project remains compatible. To the extent that surrounding properties have been developed in ways that may not be compatible with a rubble landfill, the validity of the Board's determination of compatibility is undercut. At some point, the disconnect between what is currently in the neighborhood and what had been in the neighborhood when the permit was granted will become significant enough that it will no longer be appropriate to continue to extend the time for National to obtain its permits. At that point—and sooner or later that point will be reached—it will be necessary for National to start again from scratch. In this regard, National cannot be faulted for any delay prior to 2001 because that delay was the result of unsuccessful legal challenges mounted by the

County. *See National II*, 135 Md. App. at 614. Therefore, the 20 year time-frame used by the Denying Members was inappropriate.

On remand, as part of its analysis of the statutory criteria[15] contained in § 3-1-207(e), the Board must consider whether there have been sufficient actual changes to the neighborhood surrounding the Project Site that occurred during or after 2001 to render National's special exception no longer compatible with the current established character of the neighborhood.

III.

In its cross-appeal, National argues that the Board's decision constitutes an "impermissible change of mind" from the prior decisions of the Board. We do not agree.

The cases cited by National—*Gerachis v. Montgomery County Board of Appeals*, 261 Md. 153, 156 (1971); *Whittle v. Board of Zoning Appeals*, 211 Md. 36, 49–50

---

[15] County Code Section 3-1-207(e) states in pertinent part:

> (e) Required findings. A variance may not be granted . . . unless the Board finds that:
>
> (1) the variance is the minimum variance necessary to afford relief;
>
> (2) the granting of the variance will not:
>
> (i) *alter the essential character of the neighborhood or district in which the lot is located;*
>
> (ii) *substantially impair the appropriate use or development of adjacent property*;
>
> (iii) reduce forest cover in the limited and resource conservation areas of the critical area;
>
> (iv) be contrary to acceptable clearing and replanting practices required for development in the critical area or bog protection area; or
>
> (v) *be detrimental to the public welfare*.

(1956); *Polinger v. Briefs*, 244 Md. 538, 541 (1966); and *Srukovich v. Doub*, 258 Md. 263, 274–75 (1970)—stand for the proposition that if a zoning board denies an application, the principle of administrative res judicata bars the board from subsequently granting an identical application absent a showing of changed circumstances. *See, e.g., Gerachis*, 261 Md. at 156.[16]

These cases all involve situations in which the initial application was *denied.* In this case, the initial applications were *granted*. National points no case holding that administrative res judicata applies to such cases. Moreover, its argument overlooks the fact that additional evidence was presented to the Board in this case by both parties. Additionally, as we have explained, one of the issues that the Board must address is whether the proposed rubble landfill meets the compatibility criteria of County Code County § 3-1-207(e)(i)and (ii). In that context, administrative findings as to compatibility made in prior variance proceedings years earlier may be stale.

IV.

In conclusion, we hold that:

(1) The Board was correct when it concluded that the evenly-divided vote of its members constituted a denial of National's variance application.

---

[16] National also cites *Gaywood Ass'n v. Metropolitan Transit Authority*, 246 Md. 93 (1967), but the relevant issue in *Gaywood Ass'n* was whether a decision by one administrative agency, the Public Service Commission, constituted administrative *res judicata* with regard to an application made to a separate agency, the Metropolitan Transit Authority. *Id.* at 100. The Court did not resolve the question because it decided the appeal on other grounds. *Id.*

(2) The relevant period to measure National's diligence or lack thereof is 2011–2013, which was the extension period granted by the Board's most recent variance. Furthermore, a finding of a lack of diligence is insufficient to deny a variance; the Board must also find that the lack of diligence caused an undue delay in MDE's review process.

(3) National's requested relief in the variance application, namely, that the Board allow it two additional years to obtain all required permits, did not violate the "minimum variance necessary" restriction of County Code § 3-1-207. The Denying Members' conclusion to the contrary was legally erroneous.

(4) Both the Denying Members and the Approving Members used incorrect legal analyses to determine whether granting the variance application would change the essential character of the neighborhood, impair the use and development of surrounding properties or otherwise be detrimental to the public welfare. The proper frame of analysis must take into account whether the special exception remains compatible with the surrounding area as the area has changed since 2001.

**THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS VACATED AND THIS CASE IS REMANDED TO IT IN ORDER FOR THE CIRCUIT COURT TO REMAND THIS CASE TO THE BOARD FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY COSTS.**