NATIONAL WASTE MANAGERS, INC. CHESAPEAKE TERRACE v. FORKS OF THE PATUXENT IMPROVEMENT ASSOCIATION, INC. et al., NO. 90, SEPT TERM. 2016

In 1993, the Anne Arundel county board of appeals granted petitioner special exceptions and variances to construct a landfill and sand and gravel operation; due to delays in obtaining a necessary waste disposal permit from the State Department of the Environment, three extensions of time to obtain that permit and a county building permit to construct the landfill were granted through 2011. In 2011, however, by an even split (2-2), the Board effectively denied a further 2-year extension. The Circuit Court and the Court of Special Appeals reversed that denial and remanded the case to the board for further proceedings but disagreed on the standard the board was to apply.

Held by the Court of Appeals:

(1) the even split on the board constituted a denial of the requested extension;
(2) the issue was whether the decision of the denying members was supported by substantial evidence and free of legal error;
(3) the findings of the denying members as to petitioner's diligence in pursuing the MDE and county permits were unsupported by substantial evidence and were therefore arbitrary and capricious;
(4) their findings regarding whether the requested extension was the minimum necessary to afford relief was legally erroneous; and
(5) their findings regarding the impact of the extension on the surrounding neighborhood and adjacent property were based on an erroneous standard.

The rulings of the lower courts were vacated with instructions to remand to the board of appeals for further proceedings in conformance with the Court of Appeals opinion.

IN THE COURT OF APPEALS

OF MARYLAND

No. 90

September Term, 2016

NATIONAL WASTE MANAGERS, INC.
CHESAPEAKE TERRACE

v.

FORKS OF THE PATUXENT
IMPROVEMENT ASSOCIATION, INC. et al.

Barbera, C.J.
Adkins
McDonald
Watts
Hotten
Getty
Wilner, Alan M. (Senior Judge,
Specially Assigned)

JJ.

Opinion by Wilner, J.

Filed: June 21, 2017

## BACKGROUND

The origin of this saga goes back to 1990, when petitioner (whom we shall refer to as National) sought zoning approval to construct and operate a rubble landfill on a 482-acre parcel and to conduct a sand and gravel operation on 108 acres of that same parcel. The parcel is located in an RA (Rural-Agricultural) zone in the Odenton area of Anne Arundel County. Those operations are permitted by special exception in an RA zone. *See* Anne Arundel County Code, §18-4-106 (hereafter AA Code).

What has driven this case for the last 27 years is the confluence of (1) administrative and judicial litigation during a substantial part of that period, (2) a time-consuming process for obtaining State and county permits required in order to construct and operate the proposed facilities, (3) time limits under county zoning laws on obtaining those permits, and (4) extension and tolling provisions under county law.

We begin with 1990, when a county Administrative Hearing Officer (AHO) denied National's request for special exceptions and an appeal was taken to the Anne Arundel County Board of Appeals. On December 23, 1993, after an on-site inspection and sixteen hearings spread over a three-year period, the Board of Appeals granted the special exceptions, along with two setback variances permitting the landfill to extend 760 feet closer to a residential area and 100 feet closer to a property line than otherwise was allowed. Evidence in support of the request, credited by the Board, showed that the property had been mined during the preceding 40 years and was likened to a moonscape,

full of debris, containing ravines that were 30 to 45 feet deep, and subject to erosion. Illegal dumping, target shooting, and hunting regularly occurred on the property.

After commenting on the evidence, the Board concluded that, with the conditions it intended to impose, National was capable of meeting all of the performance standards required by law and had met its burden of showing the necessity for the two requested variances. The Board found, specifically, that the proposed operations "will be no more objectionable with regard to noise, fumes, vibration, or light to nearby properties than operations in permitted uses." 1993 Memorandum of Opinion, at 30. With respect to the setback variances, the Board noted that, due to the previous mining operation, the land was cratered up to the property line and that the purpose of the variances was to permit petitioners to fill in those areas "so that the dangerous and eroding conditions no longer exist." *Id*. at 31-32. The Board's Order limited the life of the landfill operation to 12 years, from the beginning of waste collection to the final waste acceptance.

The impact of several statutes becomes relevant at this point, although they will be discussed again later. The Anne Arundel County zoning law is contained in Article 18 of the AA Code. Section 18-16-304 sets forth criteria for granting special exceptions, and §18-16-305 sets forth requirements and standards for granting variances. General standards for approving variances are contained also in §3-1-207, which is part of the AA Code dealing with the Board of Appeals. Subsections (a)(2) and (e) of that section are particularly relevant. Subsection (a)(2) provides:

"The Board of Appeals may vary or modify the provisions of Article 18 of this Code when it is alleged that practical difficulties or unnecessary hardships prevent carrying out the strict letter of that article, provided the spirit of the law shall be observed, public safety secured, and substantial justice done. A variance may be granted only upon an affirmative finding that . . . (2) because of exceptional circumstances other than financial considerations, the grant of a variance is necessary to avoid practical difficulties or unnecessary hardship, and to enable the applicant to develop the lot."

Subsection (e), as it pertains to this case, precludes the granting of a variance unless the Board finds:

"(1) the variance is the minimum variance necessary to afford relief;

(2) the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property; [or]

\* \* \* \*

(v) be detrimental to the public welfare."[1]

AA Code, § 18-16-405(a) adds, in relevant part, that "[a] variance or special exception that is not extended or tolled expires by operation of law unless the applicant within 18 months of the granting of the variance or special exception (1) obtains a building permit or (2) files an application for subdivision." Subsection (b) of that statute

---

[1] There is no conjunction following subsection (e)(1), at least in the on-line version of the AA Code. For purposes of this case, we presume, from the context of the statute, that the County Council intended subsections (e)(1) and (e)(2) to be conjunctive – that both findings have to be made to justify a variance.

3

permits an applicant to file an application for a variance to extend that time, and subsection (c) provides that "[t]he pendency of litigation may toll the time periods set forth in subsection (a) to the extent provided by law." Section 18-16-405 thus speaks of, or refers to, two kinds of variances – a subsection (a) variance, which is substantive in nature, allowing something to be done that otherwise is impermissible, such as the variances granted to National from the setback requirements, and a temporal variance referred to in subsection (b), which merely extends a time requirement for obtaining necessary permits.

Bearing on that county ordinance is Md. Code, Environment Article, §9-204(d), which requires a refuse disposal permit issued by the Maryland Department of the Environment (MDE) before a person may install a landfill, or any other refuse disposal system. As we shall explain, obtaining such a permit can be a lengthy process that can take years to complete.

The Board's decision touched off a determined effort, mostly by the county, to overturn it and scuttle any prospect of the landfill or sand and gravel operation ever opening. Much of that effort was described by the Court of Special Appeals in *National Waste v. Anne Arundel*, 135 Md. App. 585 (2000), which we need not repeat. Suffice it to say that (1) the Board's decision was ultimately affirmed by this Court in *Halle v. Crofton Civic*, 339 Md. 131 (1995), (2) declaratory judgments and injunctions were issued against the county to halt its obfuscating tactics, and (3) twice the county was held in contempt for violating orders of the Circuit Court. That aspect of the litigation came to

4

an end when the Court of Special Appeals rejected the county's arguments in *National Waste, supra* and remanded the case to address other issues, and this Court denied the county's petition for *certiorari*. *See Anne Arundel County v. National Waste*, 363 Md. 659 (2001).

The Board found that the time requirements under §18-16-405(a) were tolled due to the litigation and did not begin to run until April 13, 2001 – nearly eight years after the Board had granted the special exceptions and setback variances – when this Court denied *certiorari*, and that the two-year time limit would extend to that day in 2003.

In January 2003, National applied for a two-year extension which, after a hearing, the Board granted on April 14, 2004. In its Memorandum of Opinion, the Board recounted testimony from the Administrator of MDE's Solid Waste Program regarding the approval process for a waste disposal permit, noting that new requirements had been established since 1993, including the requirement of liners and new hydrogeological studies. The Board recognized that there were protestants who expressed concerns regarding traffic, air pollution, and land use issues – matters that had been considered when the Board had approved the special exceptions – and that there were six times more homes in the community than there were in 1990.

After considering all of the evidence, the Board found that, as a result of the delay occasioned by the litigation, National had "to begin the process nearly over again" and that it would take a minimum of three years to complete that process. 2004 Memorandum of Opinion, at 7. It added that there was no way National could obtain the

5

necessary approvals in time to comply with the zoning regulations, and that "the interaction of the overlapping regulations has resulted in the exceptional circumstance to be suffered by [National]." *Id.* The Board expressly rejected the protestants' complaints (1) that National failed to show due diligence in pursuing the MDE permit, and (2) of an adverse impact of the project on the neighborhood.

With respect to the first complaint, the Board found that "the applicants have diligently pursued the reactivation of the permit application for the rubble landfill with the State of Maryland" and that any delays in the process "have been caused by difficulties in obtaining governmental commentary on the application." *Id.* at 8. It noted in that regard a 14-month delay in the State's response to a submission by National. As to the impact on the neighborhood, the Board explained that the focus "is not on the special exceptions and variance that were approved" but only "on variances to permit a two-year extension." *Id*, at 9. It added:

> "If there are many more homes in the community now, those homes have been constructed with full knowledge of the approved special exceptions for a sand and gravel/rubble landfill. There is nothing inherently improper regarding the location of a sand and gravel/rubble landfill near residences. In fact, the County Code expressly permits such uses in residential areas so long as a special exception has been granted."

*Id.*

The Board further found that the use of the property as a sand and gravel/landfill "will not substantially impair the appropriate use or development of adjacent properties." *Id.* Its ultimate conclusion was that National had presented adequate evidence to meet the criteria set forth in AA Code, §3-1-207 to obtain the requested two-year variances.

6

In April 2005 – a year before the existing extension period was to end – National requested a further two-year extension, which the AHO granted. An appeal was taken to the Board, which affirmed that decision and granted the extension. In its 2006 Memorandum of Opinion, the Board discussed in greater detail the five-phase process for obtaining an MDE waste disposal permit, which is set forth in COMAR 26.04.07, as well as the efforts National had made in pursuit of that permit.

Phase 1 centers on gathering basic information regarding the project and the site. MDE circulates that information to Federal, State, and local agencies for review and comment, to determine whether the site is suitable for the intended use. As it had done in its 2004 Memorandum of Opinion, the Board noted the heightened standards adopted by MDE in 1997 that "required [National] to start over from scratch." 2006 Memorandum of Opinion, at 6. Phase 2 consists of a hydrogeological investigation. The applicant is required to identify and analyze groundwater and geological conditions at the site. That information also is circulated to Federal, State, and local agencies for review and comment. The Board found that, in February 2005, MDE approved National's submissions through Phase 2.

Phase 3 involves engineering design. It takes the information, especially the hydrogeological information from Phase 2, and designs a landfill with those considerations in mind. Phase 3 submissions were made in April 2005. Phase 4 is a review stage. MDE reviews all of the information from Phases 1 through 3 to ensure that all of the statutory and regulatory requirements have been met, prepares documents it will

7

need to present to the public regarding the proposed permit, and drafts a proposed permit for the site. Finally, Phase 5 is for public comment. MDE advertises and holds a hearing on the draft permit and invites the public to submit comments. After all comments are received, MDE engages in a final review and then issues the proposed permit, issues it with modifications, or denies it.

As they had earlier, the protestants complained that National had not been diligent in pursuing the permit and that the project would have an adverse impact on the neighborhood, and, as *it* had earlier, the Board rejected those complaints. Repeating much of what it had said in its 2004 Memorandum of Opinion, the Board again concluded that National's "responses to the various requests and comments have been timely, particularly given the complexity and detail of the required information" and that "[t]he use of this property as a sand and gravel/rubble landfill operation will not substantially impair the appropriate use or development of adjacent properties." *Id.* In further explanation of that conclusion, the Board observed:

> "As explained previously, these special exceptions have been approved for many years. The Zoning Regulations permit those special exceptions. The need for the now requested variances are the direct result of the review time for State approval for the operations. Although some of the area residents may not like the use of the property as a sand and gravel or rubble landfill with a variance, there is nothing inherent in those operations that impair the use or development of adjacent properties with residences or any other lawful use."

Given those conclusions, the Board granted a two-year extension, to commence September 20, 2006, but added that, if National failed to implement and complete the

8

special exceptions and variances within that two-year period, no further extensions would be granted. Aggrieved by that provision, National, in April 2008, sought judicial review and was successful in that effort. In May 2008, the Circuit Court found that provision to be arbitrary, capricious, and an abuse of the Board's discretion, and vacated it. *See Chesapeake Terrace NMW v. Board of Appeals* (Cir. Ct. Anne Arundel County, Case No. C-06-117596 AA).

National must have filed another request for extension, although we are unable to locate such a request in the record. Our assumption that such a request was made is supported by the fact that the AHO and the Board of Appeals granted it, although it took nearly three years for that to happen.[2] The proceeding before the Board was largely an updated replay of what had occurred twice before. National submitted a Phase 3 plan in April 2005, to which MDE responded in November 2006. A revised report, consisting of seven volumes, was submitted to MDE in June 2008, to which MDE responded in February 2009. A response to that was submitted in April 2009, and that was under study by MDE.

The Administrator of the MDE Solid Waste Program indicated that it would take several months to complete the Phase 3 review, that Phase 4 would be a relatively quick in-house proceeding, and the public hearings and comment (Phase 5) would then

---

[2] The Board held hearings on June 23 and 24, 2009 and on October 14 and 21, 2010, and did not issue its decision until January 3, 2011. To say that the Board moved at a "snail's pace" throughout its various deliberations since 1990 would be an unfair aspersion on the mobility of the snail.

commence. Protestants complained again about lack of diligence on the part of National and increased traffic in the neighborhood. The Board found, as it had twice before, that National "ha[d] been diligent in pursuing completion of the MDE process," and that it had "continued to supply MDE with information and communicated with them on a frequent and diligent basis." 2011 Memorandum of Opinion, at 8, 9. With respect to the community, the Board stated:

> "We find that the character of the neighborhood is that of mixed use that ranges from rural residential to commercial resources for the Odenton community. [National has] an approved, lawful special exception on this site. The approved use of this property as a sand and gravel operation and rubble landfill is known within the community and, we believe, is part of the character of the community. The rubble fill will heal a large, old mining scar on the subject property. The land is currently not in use by the community save a few trespassers who dump trash."

*Id*. at 10.

Addressing the traffic issue, the Board expressly found the protestants' testimony not to be persuasive and iterated that the issue, in any event, was not on the special exception that allowed the landfill and sand and gravel operation, which already had been approved, but only on "whether a variance to permit a two year extension will change the character of the neighborhood." *Id.* The Board granted another two-year extension dating from January 3, 2011.

Finally, we come to what brings the case here – National's request for a fourth two-year extension filed in December 2012, the Board's effective denial of that request, and a reversal of that decision and remand to the Board by the Circuit Court for Anne

10

Arundel County and by the Court of Special Appeals, albeit with different instructions as to the standard the Board was to apply in reconsidering its decision.

The Board consists of seven members, and, in the four previous proceedings, at least six of the members sat on the case. This time, for whatever reason, only four members sat – in retrospect, at least, not a wise decision.[3] Four hearings were held – one in June 2013, two in August of that year, and one in October.

At the time, the MDE permit process was still stuck in Phase 3, where it had been since 2005, partly because MDE insisted on an additional twelve months of soil and water tests. The MDE Administrator of the Solid Waste Program – the same gentleman who had testified in the three prior proceedings – attributed the delay to the size of the project.[4] With respect to progress made since 2011, the Administrator stated that, in March of that year, MDE sent a letter to National raising a number of issues, to which National responded in March 2012. A response to National's submission was sent in July of 2012, and responses to that were submitted in December 2012 and February 2013. After describing this back-and-forth, the Administrator confirmed his earlier testimony that National had been diligent in pursuing the project and said that it had done the work required and provided the information requested. Specifically, he agreed that, since the

---

[3] AA Code, §3-104(d) permits the Board to sit in panels of fewer than six members, except in appeals from the AHO's grant or denial of an application for rezoning or critical area reclassification.

[4] The Administrator stated that most landfills comprise five to fifteen acres; this one involves more than 100 acres.

11

last extension in 2011, National had been "diligently pursuing this project." He stated that Phase 3 should be completed during 2013 and, if the requested extension were granted, "the MDE process could be completed." 2013 Memorandum of Opinion, at 5.

A matter not thoroughly explored earlier surfaced, namely the attaining of *county* permits and approvals. A representative of the county Office of Planning and Zoning, which supported the proposed extension, pointed out that approval by county agencies of National's site development and storm water management plans would be necessary and that a new traffic study may be required, all of which could take up to four years. He opined that some of the work could have been done sooner but did not believe that those efforts would have changed the situation or that National would have received the necessary approvals that were then pending. Specifically, he testified that, if National had filed an application for a building permit, it would not have been processed until the MDE permit was issued.

On this evidence, two members of the Board concluded that National had been diligent in pursuing completion of the MDE permitting process, that the existing situation was not within its control, and that it constituted exceptional circumstances that warranted granting the time extension. They also believed that a two-year extension was the minimum necessary to afford relief. They concluded as well that the extension "will not alter the character of this neighborhood" and "will not substantially impair the appropriate use or development of adjacent properties" and "will not be detrimental to the

12

public welfare. 2013 Memorandum of Opinion, at 13, 14. They believed that "[n]o traffic will result from the grant of the time extension." *Id.* at 14.

The other two members found no exceptional circumstances that would warrant the extension. They concluded that National had not been diligently pursuing the MDE permit and had made no effort to begin the permitting process with the county, which they believed could have been pursued contemporaneously with seeking the MDE permit. Nor did they believe that a two-year extension was the minimum necessary to afford relief. That conclusion was based on the evidence that more than two years would be required.

The denying members expressed concern as well that the requested variances would substantially impair the appropriate use or development of adjacent properties. In that regard, they stated:

> "The pending construction of a landfill on this property has been a burden on the neighborhood for years and the community is justified in seeking an end date. [National's] lack of diligence in pursuing their applications has resulted in at least 12 years of repeated extensions of time. By allowing further extensions, the development of adjacent properties will continue to be affected as community members and developers of the area wonder whether or not they will eventually live near or adjacent to a landfill."

*Id.* at 17.

Their ultimate conclusion was that, "[b]y granting the variance requests, it will be detrimental to the public's welfare in that this community will continue to be held hostage by this application. The community has a right to expect finalization of a project that will have a significant impact." *Id.*

13

Given the 2-2 split, the Board denied the requested variances. It reasoned that "[s]ince the Petitioners were unable to convince a majority of the Board, they have failed to meet their burden of persuasion; and, consequently, the variance must be denied." 2013 Memorandum of Opinion, at 11. With that decision, MDE once again stopped processing the permit application.

National promptly sought judicial review. In a Memorandum Opinion filed in February 2015, the Circuit Court for Anne Arundel County agreed that the 2-2 vote constituted a denial of the application by operation of law – the failure of National to meet its burden of persuasion. The court rejected several of National's arguments but found legal error in the two denying members basing their vote on the entire delay since 2001. The issue, the court held, was "whether, in light of existing circumstances, [National] required at least two years from that date to obtain a building permit" and that its "history of diligence (or lack thereof) is relevant only to the extent that its cause(s) remain(s) uncorrected and is/are likely to impact [AA Code] Section 3-1-207 factors." On that basis, the court vacated the Board's decision and remanded the case for further proceedings consistent with its opinion.

That result was modified by the Court of Special Appeals. *Forks of the Patuxent v. Nat'l Waste Mgrs*, 230 Md. App. 349 (2016). That Court agreed that the 2-2 vote had the legal effect of denying National's variance application. It viewed its standard of review to be a determination of "whether the Denying Members' decision was supported by a 'reasonable basis in fact' and was not arbitrary or capricious." *Id.* at 359. It noted

the two bases relied on by the denying members in concluding that National had not been diligent – delays in responding to MDE requests and failure to pursue the county permits – and found both of them erroneous. The Court noted that none of the evidence from the MDE Administrator, the county planning staff, or National's expert showing that National had been diligently pursuing the MDE permit was challenged and that, although National may have been lax in pursuing the county permits, there was no evidence that National could have obtained those permits had it been more diligent. A lack of diligence itself, the Court held, "is insufficient to conclude that National did not face an unnecessary hardship." *Id*. at 363.

The Court also rejected the denying members' conclusion that because more than two years would be required to obtain the MDE and county permits, a two-year extension would not be the minimum variance necessary  That view, the Court said, turned the statutory standard "on its head" – that the issue was the *minimum* time necessary, not the maximum time.

With respect to whether another two-year extension would alter the essential character of the neighborhood, substantially impair the appropriate use or development of surrounding properties, or be detrimental to the public welfare, the Court disagreed with the views of both the approving and the denying members. The denying members based their conclusion on the entire 20-year delay and the uncertainty in the community that has existed all during that period as to whether the project actually would proceed. The Court of Special Appeals responded that the fact that the application is pending, by itself, does

15

not change the character of the community and, absent evidence that the uncertainty has affected property values, is not a sufficient basis to deny the application.

The approving members, the Court noted, were concerned about the propriety of re-litigating the 1993 grant of the special exceptions, but the Court concluded that the requirements in AA Code §3-1-207 pertaining to the surrounding neighborhood, adjacent properties, and the public welfare "are intended to ensure that a variance for an extension of time should be granted only if the previously approved special exception use continued to be compatible with the surrounding area." *Forks of the Patuxent, supra,* 230 Md. App. at 370-71. At some point, the Court noted, "the disconnect between what is currently in the neighborhood and what had been in the neighborhood when the permit was granted will become significant enough that it will no longer be appropriate to continue the time for National to obtain its permits." *Id*. at 371.

The Court's ultimate conclusion was that, on remand, the Board must consider "whether there have been sufficient actual changes to the neighborhood surrounding the Project Site that occurred during or after *2001* to render National's special exception no longer compatible with the current established character of the neighborhood." *Id.*

Finally, the Court rejected National's argument, made in its cross-appeal, that the Board's effective rejection of the requested extension constitutes an "impermissible change of mind" from the prior decisions of the Board. The only basis for that conclusion was the Court's observation that the cases cited by National stood for the proposition that if a zoning board *denies* an application, the principle of administrative

16

*res judicata* precludes it from subsequently *granting* the application absent a showing of changed circumstances, and that, in this case, the converse occurred.

We granted National's unopposed petition for *certiorari,* which raises three questions: (1) whether the Court of Special Appeals erred in construing the county variance statute and denying preclusive effect to prior adjudications by the Board; (2) whether it erred in remanding the case for consideration of whether the requested variance was necessary; and (3) whether it erred in failing to reverse outright the Board's decision and remand with instructions to grant the requested variance.

## DISCUSSION

### Nature and Effect of The Board's Decision

None of the parties dispute the conclusion of the Board, the Circuit Court, or the Court of Special Appeals that the even split among the four Board members constituted a rejection of National's variance request for a further extension of time. That is, of course, a threshold matter, and we agree with that conclusion. This Court has dealt several times with the effect to be given to an evenly-divided vote by a multi-member board or commission, but the best exposition of the law on that matter, after a full discussion of this Court's prior decisions, was given in *Lohrmann v. Arundel Corp.*, 65 Md. App. 309 (1985), which involved an even split by the very same board whose decision is now before us. [5] As pointed out in *Lohrmann* and as is implicit from our earlier decisions, the

[5] *See Levy v. Seven Slade, Inc.*, 234 Md. 145 (1964*)*; *Stocksdale v. Barnard*, 239 Md. 541 (1965); *Montgomery County v. Walker*, 228 Md. 574 (1962); *Gorin v. Board of Co.*

17

effect to be given to an even split depends on whether the appellate body is acting *de novo* or in a truly appellate capacity.

When an appellate board is acting in an appellate capacity, viewing the issue before it on the record made in the lower tribunal, an even split affirms the decision of the lower tribunal, as is the case in a judicial setting. When the appellate body reviews the lower decision *de novo*, however, it is treated as if exercising original jurisdiction, and, in *Halle v. Crofton Civic, supra*, 339 Md. 131, 144, we regarded the Anne Arundel County Board of Appeals, when granting the special exceptions in this very case on review from a denial of those special exceptions by the AHO, as "exercis[ing] jurisdiction akin to original jurisdiction." It could consider evidence and issues not presented to the AHO and was free to draw its own conclusions from the evidence. The Board and the two lower courts were correct in holding that the even split meant simply that National had failed to satisfy its burden of persuasion, resulting in a denial of its request.

Had a majority of the Board members (or all of them) voted to deny National's requests, we would apply the traditional standards of judicial review. Our role would be to determine (1) whether there is substantial evidence in the record as a whole to support the Board's findings and conclusions, and (2) whether its decision is premised on any erroneous conclusion of law. *Prince George's Co. v. Zimmer Dev.*, 444 Md. 490, 573 (2015).

---

*Comm'rs*, 244 Md. 106 (1966); and *cf. Howard County v. Great Oaks Apts.*, 315 Md. 218 (1989), citing *Lohrmann* but finding the issue moot.

In examining the evidence, we would defer to the Board's fact-finding and drawing of inferences if there is substantial evidence in the record as a whole sufficient to support those findings and inferences and determine whether, from that evidence, a reasoning mind reasonably could have reached the conclusions reached by the Board. *Schlosser v. Uninsured Employees*, 414 Md. 195, 205 (2010). Although no deference is required to be given to the Board's conclusions of law, as issues of law are ultimately within the domain of the Judicial Branch, courts normally give some deference to the Board's interpretations of the laws it is authorized to administer. *Kim v. Board of Physicians*, 423 Md. 523, 535 (2014).

In this instance, because the Board's denial was based entirely on the "no" votes of the two denying members, those standards must be applied to the facts and conclusions made or drawn by *them*, based on the entire record – the same standards of review focused on *their* findings and conclusions, which were the dispositive ones. That is what the two lower courts did, and they were correct in doing so.

> <u>Whether the Court of Special Appeals Erred In Failing to Affirm the</u>
> <u>Decision of the Board or To Reverse It Outright</u>

The crux of the dispute between the approving and denying members of the 2013 Board concerned the application of subsections §3-1-207(a)(2) and (e) to the temporal variances, most particularly whether (1) "practical difficulties or unnecessary hardships prevent carrying out the strict letter" of Article 18, (2) because of exceptional circumstances other than financial considerations, "the grant of a variance is necessary to

19

avoid practical difficulties or unnecessary hardship and to enable the applicant to develop the lot," (3) the requested variance was "the minimum variance necessary to afford relief," and (4) granting the variance will "not alter the essential character of the neighborhood," or "substantially impair the appropriate use or development of adjacent property," or "be detrimental to the public welfare."

As noted, the denying members based their decisions on two principal conclusions – first, that National had not been diligent in pursuing either the MDE or the county permits, and second, that too much time had elapsed since the special exceptions were granted in 1993, that the character of the neighborhood had changed since then – more houses and more traffic – and that the mere uncertainty over whether the project ever would proceed was a burden on the neighborhood. The finding regarding National's diligence implicates in particular the requirement in §3-1-207(a)(2) that a variance be granted only upon an affirmative finding that the variance is necessary to avoid practical difficulties or unnecessary hardship and to enable the applicant to develop the lot. Their view was that National's lack of diligence in pursuing the required permits precludes a finding of unnecessary hardship – in effect, the hardship cannot be self-created. The second basis implicates the requirements of §3-1-207(e).

It is clear from the pronouncements of the denying members that, with respect to their conclusion that National had not been diligent in pursuing the MDE and the county permits, they were focusing on the entire 12-year period from 2001, when the first extension was granted, to 2013, and their view of the impact of the special exceptions on

20

the neighborhood and the public welfare focused on the even longer period from 1993 to 2013. That, in itself, was error, compounded by their misreading of the record regarding a particular delay in National's response to an MDE comment that they felt was relevant.

The issues of National's diligence in pursuing the MDE permit and the impact of the project on the existing neighborhood, the development of other nearby properties, and the general public welfare were raised first in the 1990-93 proceeding that led to the granting of the special exceptions and again in each of the extension proceedings, in 2004, 2006, and 2008-11. In each of those proceedings, the Board considered the evidence presented on those issues and concluded, as of those times, that National had diligently pursued its quest for the MDE permit and that there would be no adverse impact on the neighborhood, the development of nearby properties, or the public welfare from allowing the project to proceed.

Although complaining about the total delay since 2001, the denying members focused their finding of non-diligence on what had occurred since 2011. They pointed out that it took National a year to respond to the issues raised by MDE in March 2011, that in July 2012, MDE requested supplemental data but National did not meet with MDE until September of that year, and that "it took until March 1, 2013 to receive approvals to begin the process necessary for [National] to supply MDE with the additional information requested." As noted, they also complained about National's failure to pursue necessary county permits.

21

With respect to the latter complaint, the denying members simply ignored the testimony of the county planning and zoning officer that, although National could have applied for a building permit, the application, if accepted, would not have been processed until the MDE permit was issued. There was no evidence contradicting that statement. If the county would not even begin processing a building permit application until an MDE permit was issued and the evidence showed that the issuance of an MDE permit was not likely for three years, it was wholly arbitrary and capricious for the denying members to base a lack of diligence on National's failure to apply for the county permit.

Finding a lack of diligence because of delays in pursuing the MDE permit is equally devoid of evidentiary support. It ignored entirely the uncontradicted testimony of the MDE Administrator as well as that of National's project manager that National had diligently pursued the permit both before and since 2011 and rested entirely on a one-year delay in formally responding to a comprehensive request for additional information, ignoring evidence of meetings and conversations between National and MDE personnel during that period.

The denying members' view that, because more than two years would be required to obtain the MDE and county building permit, the requested extension was not the minimum variance necessary to afford relief, as the Court of Special Appeals pointed out, was just plain wrong, a complete misconstruction of the statute. They seemed to regard that requirement as the *maximum* variance necessary, where the clear intent of the statute was to grant only what was minimally necessary, understanding that, if it turned out that

22

more time was needed, the applicant would have to come back before the AHO or the Board to request it.

With respect to the impact of the project on the neighborhood, nearby property, or the public welfare, all of that was resolved in 1993 when the special exceptions and setback variances were granted. The Board, at that time, made the findings required under AA Code, §18-16-304, including that the use would not be detrimental to the public health, safety, and welfare, that the use would be no more objectionable with regard to noise, fumes, vibration, or light to nearby properties than operations in other allowed uses, and that the use would not conflict with an existing or programmed public facility, public service, school, or road. As we observed, the Board had pointed out the dreadful condition of the property as it was then, and presumably, is now.

It is not the function of a temporal variance to relitigate those findings. Section 18-16-305, which applies to both substantive and temporal variances, is intended to assure that a variance will not alter the essential character of the neighborhood, substantially impair the appropriate use or development of adjacent property, or be detrimental to the public welfare. With respect to temporal variances – mere extensions of time, in this case to obtain permits necessary to implement what the special exceptions made permissible – the focus is a narrow and forward-looking one. It is merely whether the requested extension of time will alter the character of the neighborhood or

substantially impair the appropriate use or development of adjacent property, or be detrimental to the public welfare.[6]

That was not the focus of the denying members. Their only point was "enough is enough" – that the project had been pending for 20 years, that the community was changing and evolving over the 20-year period, and that there was "no end in sight." They cited no evidence, because there was no evidence, of how an extension to 2015 would alter the character of the neighborhood, impair the use or development of adjacent property, or be detrimental to the public welfare. In the absence of such evidence, their ultimate conclusions were arbitrary and capricious.

That does not require an outright reversal of the Board's rejection, however, but rather a remand to address and resolve the relevant issue which, in 2013, when the decision was made, was what impact, if any, the requested two-year extension to 2015 would have on the character of the neighborhood, the appropriate use or development of adjacent property, or the public welfare, accepting as fact that there was no lack of diligence on the part of National or adverse impact on the neighborhood or adjacent property warranting a rejection of an extension as of the Board's decision in 2011. That,

---

[6] The Court of Special Appeals regarded §3-1-207 as "intended to ensure that a variance for an extension of time should be granted only if the previously approved special exception use continues to be compatible with the surrounding area." *Forks of the Patuxent, supra*, 230 Md. App. At 370-71. We accept that statement with the caveat that it not be interpreted as permitting a re-litigation of previous findings regarding the nature of the proposed use or the neighborhood as it existed at any previous time. With respect to a temporal variance, §3-1-207 is forward-looking: what impact will *the extension* have?

of course, has become more complicated by the passage of time and the effect of tolling. In some manner, the Board will have to take into account the impact of the requested extension beyond 2017.

**JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND INSTRUCT THAT COURT TO REMAND TO THE ANNE ARUNDEL COUNTY BOARD OF APPEALS FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**