*LVNV Funding LLC v. Larry Finch, et al.,* **No. 46, September Term, 2018. Opinion by Wilner, J.**

**COLLATERAL ATTACK ON ENROLLED JUDGMENTS**

**MARYLAND COLLECTION LICENSING ACT – PRIVATE ACTIONS FOR DAMAGES IN VIOLATION OF ACT**

This is a class action suit by individuals against whom an unlicensed debt buyer (LVNV) obtained judgments in the District Court in 2008. Because LVNV was unlicensed, the plaintiffs sought to have the judgments declared void and sought monetary damages. The Circuit Court dismissed the action on the ground that it was an impermissible collateral attack on enrolled judgments. The Court of Special Appeals reversed, holding that the enrolled judgments were void and remanded for trial. The jury returned verdicts for the representative plaintiffs and the class. In a second appeal, the Court of Special Appeals again held the District Court judgments void but remanded for a new trial on damages. On cross petitions for *certiorari*, the Court of Appeals held:

(1) The Court of Special Appeals erred in holding the District Court judgments void. Collateral attacks on enrolled judgments are not allowed unless the court that entered the judgment had no fundamental jurisdiction to do so, and that was not the case with respect to the judgments in question.

(2) The licensing statute did, however, permit a private cause of action for acting as a collection agency without a license and remanded the case for a new trial on damages. In light of the remand, the Court did not address issues raised in respondents' cross-petition,

Circuit Court for Baltimore City
Case No. 24-C-11-007101
Argued: January 31, 2019

LVNV FUNDING LLC

vs.

LARRY FINCH, *et al.*

Barbera, C.J.
Greene
McDonald
Hotten
Getty
Adkins, Sally D. (Senior Judge,
Specially Assigned)
Wilner, Alan M. (Senior Judge,
Specially Assigned)

Opinion by Wilner, J.

Filed: April 22, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This is a class action lawsuit filed in the Circuit Court for Baltimore City against petitioner LVNV Funding LLC (LVNV) that resulted in (1) money judgments against LVNV in favor of two of the named representative plaintiffs, and (2) after a remittitur ordered by the court, a separate money judgment against LVNV in the amount of $25 million in favor of the class. In an unreported Opinion, the Court of Special Appeals affirmed the Circuit Court's rulings with respect to LVNV's liability under the Maryland Consumer Debt Collection Act (Md. Code, Title 14, Subtitle 2 of the Commercial Law Article) but remanded the case for retrial on the issue of damages.

Neither side is entirely happy with the appellate decision, and we granted cross-petitions for *certiorari* to review it. There are four principal issues before us, each encompassing sub-issues. To put it all in context, some background is necessary – the corporate structure within which LVNV operates, the nature of the business that LVNV conducts, how LVNV conducts its business, regulation of that business by the State of Maryland, and the procedural history of what is now before us.

## LVNV AND ITS AFFILIATES

LVNV is a limited liability company that was organized in Delaware in 2005, is headquartered in Las Vegas, Nevada, and appears to be managed from South Carolina. It claims to have no employees of its own. Its only business is to purchase consumer debts that are in default, mostly from affiliated entities that purchased the debts from others, and attempt to collect those debts through litigation. As determined by the Maryland Commissioner of Financial Regulation in a 2011 enforcement action (and not contested by

LVNV in this appeal), LVNV is part of an integrated conglomeration of affiliated entities that include:

- Sherman Capital, LLC and Meeting Street Partners II, Inc., which own and operate Sherman Financial Group (SFG) and Sherman Capital Markets (SCM). SCM provides management services for SFG, which the Commissioner of Financial Regulation found to be "an integrated financial services company engaged in purchasing and servicing portfolios of consumer debt that it acquires at a large discount." [1]

- Sherman Originator LLC (Originator), which is a wholly-owned subsidiary of SFG. Originator is headquartered in South Carolina. LVNV is a wholly owned subsidiary of Originator. LVNV's Board of Managers, which has day-to-day supervision over LVNV, also is based in South Carolina.

- Sherman Acquisition Limited Partnership (SALP), Sherman Acquisition II Limited Partnership (SAIILP), Sherman Acquisition II General Partner LLC (SAIIGPLLC), and Sherman Acquisition LLC (SALLC), which also are subsidiaries of SFG. The first two are debt purchasers. SALLC is involved with the management of LVNV; SALP and SAIILP have traded as LVNV; and

---

[1] *In the Matter of LVNV Funding, et al.*, Md. Comm. Fin. Reg., Case No. DFR-FY2012-012, 2011 WL 5894366 at 5-7 (2011) (hereafter *LVNV Enforcement Action*).

- Resurgent Capital Services Limited Partnership, a/k/a Resurgent Capital Services LP, f/k/a Alegis Group Limited Partnership (Resurgent), which acts as the master servicer for charged-off consumer debt owned by LVNV and is headquartered in South Carolina. Resurgent is a limited partnership in which Alegis is the general partner that owns one percent, and SFG, which is a limited partner that owns 99 percent. Both Resurgent and Alegis are subsidiaries of SFG. *Id.* Though only a one percent owner, Alegis is responsible for the management of Resurgent.[2]

What the Federal Trade Commission (FTC) referred to as "Sherman Financial" (presumably SFG) was the largest buyer of charged-off credit card debt directly from credit card issuers from 2005 to 2011, except for 2010, when it was the second largest buyer. *See The Structure and Practices of the Debt Buying Industry*, Federal Trade Commission, January 2013, at 16 and Table 5 (hereafter *2013 FTC Report*). During an overlapping period, LVNV played an active role in Maryland with respect to some of those accounts. In the *LVNV Enforcement Action*, the Commissioner found that between 1996 and 2011, LVNV was the named plaintiff in nearly 26,000 actions in the District Court of Maryland seeking affidavit judgments.[3] In the great majority of those cases, no response was filed by the defendant, no trial was held, and judgments were entered on LVNV's affidavit.

---

[2] The description of this structure is taken from findings made in *LVNV Enforcement Action, supra.* It is not clear whether any of that structure has changed since then.

[3] Cases filed between 1996 and 2004 – prior to LVNV's founding – had been filed by SALP and SAIILP and later assigned to LVNV. *See LVNV Enforcement Action,* ¶ 13a.

THE DEBT-BUYING INDUSTRY

Traditionally, when a borrower or customer failed to pay a debt on time, the creditor would do what was needed to collect the debt either by engaging with the debtor directly or by employing an attorney or outside debt collector to do so. That still occurs, of course, but a new business model that first developed in the late 1980s has become predominant in the debt collection universe, largely because (1) so much of the debt arrearage in the United States, and in Maryland, is credit card debt, and (2) Federal banking regulations require credit card companies that are bank-related to charge off credit card debt that has been delinquent for six months.[4]

The new model, for those companies, and others, is to sell their delinquent accounts to debt buyers for pennies on the dollar – normally between four and five cents but less for older accounts – and thereby recoup at least something without having to bear the expense of further collection efforts. The sales are in bulk. A three-year study by FTC revealed the sale of more than 5,000 "portfolios" containing nearly 90 million consumer accounts with a face value of $143 billion at a cost of $6.5 billion. *2013 FTC Report* at ii, 8, and Table 2.

While beneficial to the initial creditor in light of the charge-off requirement and lucrative to the debt buyer, the manner in which this new model developed and debt buyers

---

[4] Based on information supplied by the nation's largest debt buyers, FTC estimated that 62 percent of all charge-offs were of credit card debt. *See 2013 FTC Report* Table D2.

carried on their business created significant consumer protection issues. In its 2013 Report, based in part on a 2009 Study, FTC observed that it received "more consumer complaints about debt collectors, including debt buyers, than about any other single industry." *2013 FTC Report* at i. *See* also *Collecting Consumer Debts – The Challenges of Change, A Workshop Report*. Federal Trade Commission, February 2009 (hereafter *2009 FTC Report*).

In its 2013 Report, FTC noted that, in its 2009 Report, it had expressed concern that debt buyers "may have insufficient or inaccurate information when they collect on debts, which may result in collectors seeking to recover from the wrong consumer or recover the wrong amount." *2013 FTC Report.* The Commission found that, although debt buyers normally receive from the initial creditor the information needed to be disclosed to the debtor under the Federal Debt Collection Practices Act (15 U.S.C. § 1692g) they often do not receive data relating to disputes raised by the debtor or a breakdown of how much of the debt is for interest, fees, or penalties, and that they rarely disclose to the debtor other information, such as data indicating that collection may be barred by limitations, that may be relevant to whether the alleged debtor is the actual debtor or owes the money and, if so, how much. *2013 FTA Report* at iii-iv.

Those concerns, and others, were relayed to this Court by its Standing Committee on Rules of Practice and Procedure in the Committee's 171st Report dated July 1, 2011, which led the Court to adopt amendments to Md. Rules 3-306, 3-308, and 3-509 dealing with judgments entered on affidavit rather than trial. The Rules Committee noted that

5

"[b]oth nationally and in Maryland, there have been a multitude of cases in which the ultimate owner of the account sues the person it believes to be the debtor, knowing from experience that the defendant often does not file a notice of intention to defend or appear for trial," that it had been well-documented that the plaintiff often has insufficient reliable information regarding the debt or the debtor, and "had the debtor challenged the action, he or she would have prevailed." 171st Report at 7. Indeed, the Committee added that "[i]n many instances, when a challenge is presented, the case is dismissed or judgment is denied. *Id.*

STATUTORY REGULATION

Three Maryland consumer protection statutes govern debt collection activity – the Maryland Collection Agency Licensing Act (MCALA) (Md. Code, Business Regulation Article (BR), §§ 7-101 through 7-502); the Maryland Consumer Debt Collection Act (MCDCA) (Md. Code, Commercial Law Article (CL), §§ 14-201 through 14-204); and the State Consumer Protection Act (CPA) (Md. Code, CL §§ 13-101 through 13-501).

MCALA is the most direct. With two exceptions not relevant here, BR § 7-301(a) provides that "a person must have a license [issued by the State Collection Agency Licensing Board] whenever the person does business as a collection agency in the State." Section 7-401 adds that, except as provided in that title, "a person may not knowingly and willfully do business as a collection agency in the State unless the person has a license." Section 7-101(c) defines "collection agency" as including "collecting for, or soliciting from another, a consumer claim" and "collecting a consumer claim the person owns, if the claim

6

was in default when the person acquired it." Although LVNV began its debt collecting activity upon its founding in 2005, it did not obtain a collection agency license until February 18, 2010.

MCDCA also deals with consumer debt collection. CL § 14-202(8) provides that, in attempting to collect an alleged debt, a collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Section 14-203 provides that "a collector who violates any provision of this subtitle is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury." Section 14-201(b) defines "collector" as "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction."

CL § 13-303, which is part of the CPA, prohibits a person from engaging in an "unfair or deceptive trade practice" in "the collection of consumer debts." Section 13-301 defines "unfair or deceptive trade practice" as including any violation of "Title 14, Subtitle 2 of this Article, the Maryland Consumer Debt Collection Act." Section 13-408 permits a person to bring an action to recover for injury or loss sustained as the result of a practice prohibited by CPA and, if the person prevails, to be awarded attorneys' fees.

## PROCEDURAL HISTORY OF THIS CASE

This case was preceded by another class action suit filed against LVNV by Jason Hauk and Freddy Velazquez in the Circuit Court for Frederick County in October 2009. The gravamen of that action was largely the same as the one now before us, namely that

7

LVNV, acting as an unlicensed debt collector, had pursued consumer debt collection actions against the defendants in the District Court of Maryland in violation of MCALA (BR § 7-301) and that it threatened or took action it had no right to take in violation of MCDCA and its Federal counterpart, the Federal Debt Collection Practices Act (15 U.S.C. § 1692). One difference was that LVNV never recovered a judgment against Hauk or Velazquez; the action against Hauk ended with a verdict for Hauk, and LVNV dismissed the action against Velazquez when he filed a notice of intent to defend.

The Complaint contained four counts: for declaratory and injunctive relief ordering LVNV to disgorge all amounts it obtained while acting illegally as a collection agency (Count I); for money damages and attorneys' fees for violation of MCDCA (Count II); for money damages and attorneys' fees for violation of CPA; and for statutory damages under the Federal Debt Collection Practices Act (Count IV).

The alleged class in that action included all persons in the State of Maryland who, within three years prior to the filing of the complaint, "were contacted by the Defendant in connection with any effort to collect a debt." That action was removed to Federal court by LVNV, where, after the court granted a motion to dismiss Count I but denied the motion to dismiss the State law claims in Counts II, III, and IV, it eventually was settled. *See Hauk v. LVNV Funding*, 749 F. Supp. 2d 358 (D. Md. 2010). The settlement agreement narrowed the class to persons who, from October 1, 2007 through February 17, 2010, were sued by LVNV in Maryland to collect on a debt, *but excluded persons against whom a judgment had been entered* or who had filed for bankruptcy protection.

8

The next event that preceded the filing of the instant complaint was the *LVNV Enforcement Action* commenced by the Commissioner of Financial Regulation against LVNV and its various affiliates in July 2011. On October 25, 2011, a Summary Order was entered requiring LVNV to cease its collection activities and suspending LVNV's belatedly obtained collection agency license. A year earlier, on May 5, 2010, the State Collection Agency Licensing Board had issued an Advisory to purchasers of consumer claims in default clarifying that it had been the Board's "consistent position that a Consumer Debt Purchaser that collects consumer claims through civil litigation is a 'collection agency' under Maryland law and required to be licensed as such, regardless of whether an attorney representing the Consumer Debt Purchaser in the litigation is a licensed collection agency," citing BR § 7-101(c).

As noted, in the *LVNV Enforcement Action*, the Commissioner found that, since 2005, LVNV had been acting as an unlicensed debt collection agency in violation of MCALA and MCDCA, that "tens of thousands" of actions brought by LVNV in the District Court of Maryland requesting judgment on affidavit "knowingly contained false, deceptive, or deficient complaints and supporting affidavits," and that, in some of those actions, LVNV had claimed and received pre-judgment interest amounts that included compound interest, which is prohibited by Maryland law. The Summary Order directed LVNV to cease and desist its efforts and suspended the collection agency license that it had obtained in 2010.

The Enforcement Action ended on June 28, 2012 with a Settlement Agreement in which, without acknowledging any wrongdoing, LVNV agreed to pay a penalty of one million dollars, dismiss with prejudice all collection cases filed in a Maryland court prior to the date of the agreement, and, with certain exceptions, provide restitution to all consumer debtors against whom a judgment had been obtained or whose case had been settled prior to the date of the agreement by crediting their accounts for prejudgment interest and attorneys' fees awarded by the court or that were part of the settlement.

This action, initially by Larry Finch and Kurt Dorsey as representative plaintiffs, was filed on November 9, 2011. LVNV had filed collection suits against Finch and Dorsey in the District Court in 2008 – prior to obtaining a collection agency license. It obtained default judgments against them and had garnished Finch's wages. The class consisted of those persons sued by LVNV in Maryland courts from October 30, 2007 through February 17, 2010 *against whom LVNV obtained a judgment in its favor* in an attempt to collect a consumer debt.[5] The complaint sought the disgorgement of all sums LVNV received as a result of the judgments it improperly obtained and an injunction against any attempt to collect further amounts on those judgments.

On LVNV's motion, the Circuit Court dismissed that complaint on the ground that it amounted to an impermissible collateral attack on enrolled District Court judgments. In

---

[5] By limiting the class to those persons against whom LVNV had obtained a judgment, the complaint excluded those persons who had remained as class members in the Federal action and had participated in the settlement of that case.

10

a reported Opinion, the Court of Special Appeals reversed that judgment and remanded the case for further proceedings. *Finch v. LVNV Funding*, 212 Md. App. 748 (2013).

LVNV conceded that it did not have a collection agency license when it obtained its judgments against Finch and Dorsey but claimed that, as a "passive" debt buyer, it was "confused" as to whether it needed one. Relying in part on *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp.2d 719 (D. Md. 2011), the appellate court rejected that defense. The issue then became whether the violation of MCALA made the District Court judgments void or merely voidable and, if void, whether those judgments could be collaterally attacked.

Following the view of an intermediate appellate court in Illinois (*LVNV Funding, LLC v. Trice*, 952 N.E.2d 1232 (Ill. App. 2011)), the Court of Special Appeals reached the conclusion that proceeding to collect a consumer debt without a license constituted an attempt to enforce a right that did not exist and made the resulting judgments void and not merely voidable. A judgment that is void, it continued, may be collaterally attacked at any time in any court.

Upon that ruling and the denial of *certiorari* by this Court (435 Md. 266 (2013)), the case returned to the Circuit Court, where a six-count amended complaint was filed. Ronald Jackson was added as a representative plaintiff. LVNV had sued Jackson in 2008. A judgment on affidavit that included pre-judgment interest and attorneys' fees was entered against him, and his wages were garnished. The amended class action complaint proposed a class consisting of those persons sued by LVNV in a Maryland court between October

11

30, 2007 through February 17, 2010 against whom LVNV obtained a judgment in its favor in an attempt to collect a consumer debt, and a subclass consisting of all members of the class who had paid any amounts to LVNV.

Count I sought a declaratory judgment that the District Court judgments against the class members were void because they were obtained when LVNV was acting unlawfully as an unlicensed collection agency. Count II sought a declaration on behalf of the named plaintiffs and the subclass that LVNV is liable for prejudgment interest on the amounts of interest and attorneys' fees it refunded to class members. Count III sought a money judgment in favor of the subclass for all judgment sum interest it had collected from the subclass. Count IV asserted that LVNV's conduct was in violation of MCDCA and CPA and sought a money judgment in favor of Finch, Jackson, and the subclass for violations of MCDCA. Count V sought a money judgment in favor of Finch, Jackson, and the subclass for money had and received by LVNV plus interest and costs. Finally, Count VI sought money damages for the named plaintiffs and the class for the cost of proceeding to have the District Court judgments against them declared void.

Through interlocutory rulings, the court ruled, consistent with the Court of Special Appeals Opinion, that judgments obtained by LVNV in a Maryland court between October 30, 2007 and February 17, 2010 in an attempt to collect a consumer debt were void, and certified the class and subclass, the latter consisting of all members of the class who paid any amounts to LVNV.

12

The case was submitted for trial by a jury, but it is not entirely clear whether the trial, verdict, and judgment involved the claims of all members of the class or only the claims of members of the subclass.[6]  In accordance with the court's instructions, the jury was asked to determine, separately, (1) whether Finch and Jackson proved that LVNV was unjustly enriched (money had and received) by its collection of monies from them, (2) whether they proved that LVNV violated MCDCA,[7] (3), if the answer to (1) or (2) was "yes," what damages should be awarded and whether they were entitled to prejudgment interest, and (4) what sum of restitution the class should recover from LVNV for monies obtained or received from the class.[8]

The jury said "no" to prejudgment interest but awarded specific amounts of damages to Finch and Jackson and $38,630,344 to the class. Judgments were entered in accordance with those verdicts, but, pursuant to a motion for judgment NOV, the court granted a remittitur and reduced the judgment in favor of the class (or subclass) to $25 million.

---

[6] The words "class" and "subclass" were used interchangeably throughout the case. The amended complaint sought declaratory relief and damages in favor of both the class and the subclass.  *Compare* the verdict sheet, which refers to "the class," with the Administrative Order of November 10, 2015 at E298-99 and Motion in Limine at E389-93, which set for trial only actions by the subclass.  We note also that, in its instructions to the jury, the court referred to "the class" as consisting of 1,589 individuals.  *See* E647, p. 44.  Those were the members of the subclass; the class contained more than 2,800 persons.  *See* E596, p.116.

[7] MCDCA was the only statute mentioned on the verdict sheet, and it was mentioned only in connection Jackson and Finch, not the class.

[8] The jury was not asked to return a verdict as to Dorsey. He was included as a named plaintiff in the amended complaint but must have dropped out of the case at some point.

That produced another appeal, which challenged the Circuit Court's rulings (1) that LVNV was a collection agency subject to MCALA, (2) that the District Court judgments obtained by LVNV during the period it was not licensed were void and therefore subject to collateral attack, (3) that there was sufficient evidence to support the jury's verdict of liability, (4) that excluded evidence proffered by LVNV regarding its liability for violating MCDCA and for unjust enrichment, (5) that omitted an instruction on the proper method for determining a monetary award for unjust enrichment, (6) that certified the class and subclass, (7) regarding the appropriate limitations period in defining the class and subclass, and (8) that granted a remittitur and reduced the judgment in favor of the class to $25 million.

The Court of Special Appeals considered all but the last of those challenges. As noted, it affirmed the finding of liability on the part of LVNV for violating MCDCA but remanded the case for a new trial on damages. The Court declined to revisit its holdings in the first appeal that LVNV was required to be licensed, that its pursuit of collection cases without a license constituted a violation of both MCALA and MCDCA, and that, as a result, the judgments it obtained in the District Court were void. It concluded that there was sufficient evidence of unjust enrichment to submit that issue to the jury but that the Circuit Court's instructions on the calculation of damages were too imprecise to give sufficient guidance to the jury on the appropriate method of calculating a monetary award under the theory of unjust enrichment.

LVNV raised three issues in its petition for *certiorari* – whether a judgment in favor of an unlicensed collection agency is void; whether the lower courts erred in finding a private right of action in MCALA or MCDCA; and whether MCALA was intended to apply to entities such as LVNV that "passively" own consumer debt but retain licensed collection agencies to collect it. In their cross petition, the plaintiffs complain only about LVNV's limitations defense, which is relevant only to the scope of the class. We shall deal with these issues in a different order.

## WAS LVNV REQUIRED TO BE LICENSED DURING THE RELEVANT PERIOD

LVNV continues to argue that, because it is a "passive" debt buyer and owner, because it has no employees, and because it does nothing more than refer debts to Resurgent for collection, it does not constitute a collection agency for purposes of MCALA and therefore was never required to obtain a collection agency license, even though it eventually did so in 2010. That claim was rejected twice by the Court of Special Appeals and three times by the Commissioner of Financial Regulation, but it has yet to be considered on its merits by this Court. We shall reject it as well.

The issue hinges on a construction of MCALA, in particular BR § 7-107(c), which defines the term "collection agency." We recently explored in some detail the text and legislative history of that section, and MCALA in general, in *Blackstone v. Sharma*, 461 Md. 87 (2018). The issue there was whether MCALA required foreign statutory trusts that acted as a repository for defaulted real estate mortgage debts to have a collection agency license before their trustees could institute foreclosure actions against the

15

mortgaged property. Upon concluding that the General Assembly had chosen an entirely different method of regulating real property foreclosures, the Court held that MCALA was not intended to apply to that activity by those trusts.

The relevance of *Blackstone* to this case lies in the Court's analysis of MCALA, which points to a different result with respect to debt buyers like LVNV. The statute was first enacted in 1977 and, for 30 years, focused on persons who directly or indirectly solicited from or collected *for others* consumer debt – initially debts arising from the acquisition of property or services for personal, family, or household purposes. The version in place in 2006 defined "collection agency" in relevant part as a person who "engages directly or indirectly in the business of collecting for, or soliciting from *another*, a consumer claim." (Emphasis added).

As we pointed out in *Blackstone*, by 2007, regulators, and ultimately the General Assembly, recognized the impact of the new business model of creating companies that, instead of collecting debt for the creditor, usually on a contingent fee basis, purchased that debt (which, with respect to credit card debt, the creditor otherwise would have to charge off) for their own account and either pursued collection on their own behalf or resold the debt to other debt buyers who pursued collection for *their* benefit. The impact was that these debt buyers were not required to be licensed and thus were free to engage, at least on a State level, in activities that were largely unregulated and often bordered on fraud.

To deal with that, at the urging of the Commissioner of Financial Regulation, the General Assembly added to the definition of "collection agency" a person "who engages

16

directly or indirectly in the business of . . . collecting a consumer claim the person owns, if the claim was in default when the person acquired it." The testimony given to the Legislature in support of that bill was that the intent of the amendment was to "close a loophole" and require that buyers of consumer debt in default be licensed before engaging in collection efforts. *Id.* at 129. Although there was no intent to extend the law to real property mortgage foreclosures, the plain language of the amendment, coupled with the legislative history of it, unmistakably shows an intent to include entities like LVNV. The 2007 amendment took effect October 1, 2007. From that date, debt buyers who engaged directly or indirectly in the business of collecting consumer debt that they owned and that was in default when they acquired it needed to be licensed.[9]

---

[9] In arguing that it was not required to be licensed, or at least was "confused" regarding that matter, LVNV relies on a June 20, 2007 letter addressed to a representative of a debt buyer trade association by Kelly Mack. Ms. Mack, an employee of the Department of Labor, Licensing, and Regulation, wrote the letter purportedly on behalf of the Chair of the Collection Agency Licensing Board. The letter stated that "it is the position of the Commissioner that a debt buyer who purchases debt in default, but is not directly engaged in the collection of these purchased debts, is not required to obtain a collection agency license provided that all collection activity performed on behalf of such debt buyer is done by a properly licensed collection agency in the State of Maryland."

LVNV neglects to mention two critical facts. First, Ms. Mack filed an affidavit in this case attesting that (1) her letter was in response to the trade association's request for an opinion, (2) that request did not refer to collecting consumer claims through civil litigation in Maryland courts, (3) her response "was directed exclusively at traditional collection activities not involving the use of Maryland courts or any other judicial process," (4) her letter referred to an exception for business entities who were *not directly engaged* in the collection of these purchased debts," (emphasis in original), and (5) "as Consumer Debt Purchasers who bring debt collection actions in Maryland State courts *are* directly involved in the collection of consumer debts (usually as the named Plaintiff in a legal action), they would be outside the scope of the exception discussed in my letter." Second, also filed in the action was an affidavit of Gordon Cooley, the Commissioner of Financial Regulation, who attested that "[t]he [Department of Labor,

17

DID LVNV ACT UNLAWFULLY ACT AS A COLLECTION AGENCY

Shooting the last arrow in this quiver, LVNV claims that it was not engaging in that business because it had no employees and did nothing more than turn accounts over to Resurgent, which *was* a licensed collection agency, and that it was Resurgent that did the collection work. Apart from the conclusion reached above, the evidence belies that contention in a number of respects. LVNV and Resurgent are not independent entities with entirely separate missions but integral parts of a composite corporate structure that sought to avoid regulation of the very kind of activity that the General Assembly believed needed regulation.

We have described the interconnections within the Sherman family of companies, as found by the Commissioner of Financial Regulation, which LVNV has not contested. In its brief, it claims that it merely "serves as a special purpose financing vehicle to hold debt purchased *and collected* by affiliates in order to facilitate asset-based financing for the benefit of the larger corporate group" and "has no offices and no employees." (Emphasis added). That last part is belied by findings made by the Commissioner of Financial Regulation in the *LVNV Enforcement Action* that, in the consumer actions filed by LVNV

_____

Licensing and Regulation] and the [Collection Agency Licensing Board] have consistently taken the position that Consumer Debt Purchase[r]s *i.e.* persons who acquire consumer debt which is in default at the time of acquisition and who collect such debt through civil litigation are 'collection agencies' and are subject to the licensing requirements of [MCALA]." In light of this evidence and the plain wording of the statute, neither the Circuit Court nor the Court of Special Appeals erred in concluding that, as of October 1, 2007, LVNV was required to be licensed before engaging in its collection activities.

in the District Court of Maryland, affidavits supporting their quest for judgment were submitted by various individuals claiming to be "authorized representatives" of LVNV who were "authorized to execute the affidavit on behalf of LVNV," were "familiar with the books and records" of LVNV, and claimed personal knowledge of the facts. *Id*. at 10, 11.

With respect to employees and offices, LVNV has a Board of Managers located in South Carolina that exercises immediate control over whatever exists in Maryland. Presumably, there is an office where the members of that Board meet and decide which debts to turn over to its sister company, Resurgent, and when. We note as well the evidence that LVNV is a subsidiary of and controlled by Originator, which in turn is controlled by SFG which, through its other subsidiaries, purchases the debt that LVNV holds *and sometimes has actually traded as LVNV*. (Emphasis added).

From and after October 1, 2007, LVNV was required to be licensed before engaging in efforts to collect consumer debt.[10] Its collection activity from and after that date until it obtained its license in February 2010 was unlawful under MCALA, MCDCA, and CPA.

---

[10] We reach this conclusion upon our own analysis. We have noted that the Commissioner of Financial Regulation has reached the same conclusion on multiple occasions, including three that involved LVNV. We observe that, "[a]lthough no deference is required to be given to the [agency's] conclusions of law, as issues of law are ultimately within the domain of the Judicial Branch, courts normally give some deference to the [agency's] interpretations of the laws it is authorized to administer." *Nat'l Waste Mgrs v. Forks of the Patuxent*, 453 Md. 423, 441 (2017); *Kim v. Board of Physicians*, 423 Md. 523, 535 (2011).

## WERE THE DISTRICT COURT JUDGMENTS OBTAINED BY LVNV VOID

In their initial Complaint, the plaintiffs did not claim that the judgments obtained by LVNV were void but only that LVNV, as an unlicensed consumer debt collector, had no right to pursue collection activity and should be made to disgorge any amounts collected. LVNV argued that such a claim amounted to an impermissible collateral attack on those judgments, and the Circuit Court agreed. The Court of Special Appeals held to the contrary, that "a judgment obtained by an unlicensed collection agency is void." *Finch v. LVNV Funding, supra*, 212 Md. App. at 759. When this Court denied *certiorari*, that ruling, in a reported Opinion, became binding on the Circuit Court, which duly followed it when the case was remanded. When raised again in the second appeal, the Court of Special Appeals found no reason to depart from its earlier ruling and confirmed it. The issue is now properly before us.[11]

---

[11] In a motion to dismiss this appeal, respondents argue that the issue of whether the District Court judgments were void is not properly before us because (1) that issue was decided by the Court of Special Appeals in the first appeal, (2) it was raised in LVNV's petition for *certiorari* from that decision, (3) we denied that petition, and (4) having decided to raise that issue in its *certiorari* petition and having the petition denied, LVNV may not relitigate it. For that proposition, they rely on *Jones v. State*, 357 Md. 408 (2000). We find *Jones* to be distinguishable, however.

The appeal in *Jones* raised the issue of whether the defense of self-defense applied to a charge of reckless endangerment. The Circuit Court refused to instruct the jury that the defense applied. The Court of Special Appeals agreed and affirmed the judgment of conviction. We granted Jones's petition for *certiorari* to determine whether that conclusion was correct. The State had filed a cross-petition claiming that the issue was waived in the Circuit Court. We denied the cross-petition and then precluded the State from pursuing the waiver argument in its brief. The basis for that ruling was that "[u]nder our certiorari process, this Court will only consider matters in a petition for certiorari that we have granted." *Id.* at 419.

20

Judgments, by and large, are meant to be final. Even the court that rendered them has but a limited ability to open and revise them. That is because, as this Court said 141 years ago and has repeated several times since, "[i]t is most desirable of course that there should be an end to litigation, and a judgment is presumed to be a settlement of all matters in dispute in that particular case; and once entered, parties are no longer under the necessity of preserving the evidences upon which their claims rested. By it new rights are acquired, and if stricken out other claims may intervene, and the plaintiff may not only lose his lien, but in many cases the entire debt." *Abell v. Simon*, 49 Md. 318, 324 (1878); *Penn Central Co. v. Buffalo Spring*, 260 Md. 576, 584-85 (1971).

In furtherance of that principle, the ability to challenge a civil judgment, other than by an appeal, is limited, even in the court that entered it. The court that rendered the judgment has discretionary revisory power over it for only 30 days. On the 30th day, the judgment becomes "enrolled," and after that time, the court may revise it only upon a finding of fraud, jurisdictional mistake, or irregularity, which are narrowly construed. Md. Rules 2-535 and 3-535; *Andresen v. Andresen*, 317 Md. 380, 388-89 (1989); *Tandra S. v. Tyrone W.*, 336 Md. 303, 315 (1994).

---

We adhere to that ruling, which is central to *certiorari* practice. In this case, although we denied LVNV's petition for *certiorari* in the first appeal, we granted its petition in this one. There is no inconsistency in doing so. The case was in a very different posture the first time. *Res judicata* principles do not preclude this Court from agreeing to review an issue that it declined to review at an earlier stage or time. The motion to dismiss is denied.

21

Collateral attacks, whether in the court that entered the judgment or in any other court, are even more severely limited and are permitted only when the court that rendered the judgment had no *jurisdiction* to do so. Indeed, there are few principles of law that are so firmly and consistently entrenched in our jurisprudence, and for good reason. As early as 1824, this Court drew a distinction between judgments that were merely voidable because of irregularities in the proceeding that produced them and those that were absolutely void *ab initio*. *See Barney v. Patterson*, 6 H. & J. 182, 204 (1824). In *Ranoul v. Griffie*, 3 Md. 54, 60 (1852), the Court explained:

> "The principle is well settled, that the judgment of a court of competent jurisdiction, when incidentally in question, or offered as evidence of title in any court, is conclusive upon the question decided, and cannot be impeached on the ground of informality in the proceedings, or error or mistake of the court, in the matter which has been adjudicated."

Cases confirming that principle and elucidating it further are found throughout the Nineteenth and Twentieth Centuries and into our own. *See Dorsey v. Thompson*, 37 Md. 25, 49 (1872); *Fook's Executors v. Ghingher*, 172 Md. 612 (1937) and *County Commissioners v. Carroll Craft* 384 Md. 23 (2004). In *Carroll Craft*, we explained:

(1) "A judicial decree or judgment made by a court lacking jurisdiction to enter it is void."

(2) "The term 'jurisdiction' can have different meanings [ ] depending on the context in which it is used. It can refer to either the *power* of the court to render a valid decree, or the *propriety* of granting the relief sought." [cleaned up].

(3) "It is only when the court lacks the first kind of jurisdiction which [ ] this Court termed 'fundamental jurisdiction' that its judgment is void." [cleaned up].

22

(4) "[F]undamental jurisdiction refers to 'the power to act with regard to a subject matter which is conferred by the sovereign authority which organizes the court, and is to be sought for in the general nature of its powers, or in authority specially conferred.' . . . It is the power that the law confers on a court to render judgments over a class of cases, within which a particular case may fall."

(5) "Thus, the main inquiry in determining 'fundamental jurisdiction' is whether or not the court in question had general authority over the class of cases to which the case in question belongs."

(6) "[A] court still retains its 'fundamental jurisdiction' though its ability to exercise that power may be 'interrupted' or circumscribed by statute or Maryland Rule. Indeed, this Court has repeatedly declined to hold void court or agency decisions that exceeded statutory limits but fell within the basic or fundamental jurisdiction of the court or agency."

*Id.* at 44-45.

These principles, of course, apply only to collateral attacks on enrolled judgments. A claim that the court is without non-fundamental jurisdiction certainly may be raised as a defense in a pending action seeking the judgment or while the court retains revisory power over a judgment it has issued.

In its two decisions, the Court of Special Appeals recognized the distinction between void and voidable judgments but, relying on *Stein v. Smith*, 358 Md. 670 (2000), *Turkey Point Property v. Anderson*, 106 Md. App. 710 (1995), *Harry Berenter v. Berman*, 258 Md. 290 (1970), and *McDaniel v. Baranowski*, 419 Md. 560 (2011) concluded that an enrolled judgment may be void for reasons other than a lack of fundamental jurisdiction as defined in *Carroll County* and its predecessors. It erred in doing so. None of those cases involved a collateral attack on an enrolled judgment.

In *Stein*, an action was filed by a corporation whose charter had been revoked and which, as a result, was not authorized to file the action. When that defense was raised, an

23

amended complaint was filed, in that case, by an individual who claimed to be doing business in the corporate name. The problem was that limitations had run by then, and the question was whether the individual could get the benefit of a relation back to when the initial complaint was filed. Relying on language in *Atlantic Mill & Etc., Co. v. Keefer*, 179 Md. 496, 500 (1941) that a mechanics lien filed by a corporation whose charter had been revoked was "inoperative, null, and void," we concluded that there was no relation back and that the amended complaint was properly dismissed.

*Turkey Point* involved a similar situation. The owners of waterfront property sought rezoning and a variance, which the county zoning authority granted over the objection of a property owners association. The association petitioned for judicial review and then appealed the Circuit Court's affirmance. The association, however, was not represented by an attorney, as required by law, and the Court of Special Appeals, in a direct appeal from the Circuit Court's judgment, concluded that the association's petition for judicial review was a "nullity."

*Harry Berenter* was a direct appeal from a judgment refusing to enforce a mechanics' lien filed by an unlicensed contractor. The Court did hold that, "if a statute requiring a license for conducting a trade, business or profession is regulatory in nature for the protection of the public, rather than merely to raise revenue, an unlicensed person will not be given the assistance of courts in enforcing contracts within the provisions of the regulatory statute because such enforcement is against public policy." We confirm that ruling in the context it was made, but it does not extend to allowing collateral attacks on enrolled judgments. That is true as well with *McDaniel*.

24

None of those cases, nor any like them, persuade us to depart from the principle we have adhered to for well over a century stressing the importance of preserving enrolled civil judgments from collateral attack on any ground other than the lack of fundamental jurisdiction to render those judgments. This is not a matter of blind adherence to an outmoded juridical policy. Enrolled judgments create important vested rights that not just the parties, but the entire public, have a right to rely upon. The District Court clearly had fundamental jurisdiction over the collection actions filed by LVNV, notwithstanding that LVNV had no legal authority to file them, and the two lower courts in this case erred in declaring them void.

WHERE DOES THAT LEAVE US – PRIVATE RIGHT OF ACTION

Relying on the Court of Special Appeals' first Opinion, respondents, on remand, did seek a declaration that the District Court judgments were void, but that was not the only relief sought or necessarily critical to the affording of other relief. The larger issue, raised by LVNV, is whether MCALA or MCDCA (or CPA) permit a private cause of action for violation of those statutes. LVNV asserts in its brief that neither the text nor the legislative history of MCALA demonstrates an intent by the General Assembly to allow a private right of action for violation of the statute. If the Legislature had such an intent, contends LVNV, it would have said so. The General Assembly *did* say so, unmistakably and unambiguously.

As we have pointed out, MCALA, with exceptions that do not apply here, requires that a person have a collection agency license whenever the person does business

25

as a collection agency and makes it a criminal offense for a person knowingly and willfully to do business as a collection agency in Maryland without one. BR §§ 7-301 and 7-401. CL § 14-202, which is part of MCDCA, expressly prohibits a debt collector from claiming, attempting, or threatening to enforce a right with knowledge that the right does not exist.

An unlicensed debt collector who, in the furtherance of its business, attempts to collect a debt through litigation unquestionably is attempting to enforce a right that, *for it*, does not exist. CL § 14-203, also part of MCDCA states that "[a] collector who violates any provision of this subtitle is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury." *Mostofi v. Midland Funding*, 223 Md. App. 687, 702-03 (2015). It is hard to imagine, notwithstanding LVNV's importuning, a clearer expression of an intent to provide a private remedy for the violation of MCALA – a remedy that permits recovery of "any damages," including for emotional distress.

LVNV is correct in asserting that "[t]his case went to the jury on the mistaken theory that the underlying *debts* owned by LVNV were void." LVNV Brief at 25. It must be remanded, once again, for a reassessment of damages in accordance with what is allowed under CL § 14-203 which, as happened in the earlier remand, may involve the filing of an amended complaint and, absent a settlement, will require a retrial on the damages issues. Although the District Court judgments may not be collaterally attacked, BR § 7-401, read in conjunction with § 7-101(c), would permit declaratory and injunctive relief precluding LVNV from taking any action to enforce those judgments and for *any* damages incurred by the plaintiffs as the result of LVNV's collection efforts. Because of

26

this remand for further proceedings with respect to damages, we need not address the issues raised in respondent's cross petition. If raised again in the Circuit Court, the context may be different.

**JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER/CROSS-RESPONDENT.**